UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------------X

NATASHA TAFT,

      Plaintiff,

  -against-

 AGRICULTURAL BANK OF CHINA LIMITED,

      Defendant.

-------------------------------------------------------------------------X

Docket No:-

**COMPLAINT**

**PLAINTIFF HEREBY
DEMANDS A TRIAL
BY JURY**

   Plaintiff, Natasha Taft, as and for her Complaint, all upon information and belief, respectfully

alleges as follows:

## JURISDICTION AND VENUE

  1.  This Court has original jurisdiction over the subject matter of this litigation pursuant

to 28 U.S.C §1331, in that certain of the Plaintiff's claims arise under the laws of the United States,

namely under the Bank Secrecy Act, 31 U.S.C. §5328(a), and the Financial Institutions Reform,

Recovery and Enforcement Act, 12 U.S.C. §1831j(b).

  2.  Venue is proper under 42 U.S.C §2000e-5(f)(3) and 28 U.S.C §1391(b) because the

events or omissions giving rise to the claims occurred in the Southern District of New York and the

Defendant resides in this District.

## IDENTITY OF PARTIES

  3.  At all relevant times, Natasha Taft ("Taft") was employed by Defendant, Agricultural

Bank of China  ("ABC"), from August 2014 until June 5, 2015, when she was constructively

discharged.

4.      ABC is one of the "Big Four" banks in the People's Republic of China, with headquarters in Dongcheng District, Beijing and branches throughout mainland China and around the world, including New York.

5.      At all relevant times mentioned herein, ABC operated a licensed branch in the County, City and State of New York, from which Taft performed her duties for ABC.

## BACKGROUND RELEVANT TO ALL CAUSES OF ACTION

6.      Taft commenced her employment with ABC in August 2014 as Chief Compliance Officer ("CCO") and the Head of Legal and Compliance.

7.      At the time her employment began, Ming Yu ("Yu") was the General Manager of the New York Branch, and Jason Zhang ("Zhang") was the Deputy General Manager and the individual to whom Taft reported.

8.      At that time, Taft was a seasoned and distinguished Compliance Officer with 18 years experience in the field of compliance and anti-money laundering.

9.      As Chief Compliance Officer, Taft was the only "C" level female and the only non-Chinese female manager.

10.     From the start of her employment, Taft worked diligently and effectively to address and resolve serious issues identified during the New York State and Federal Bank Secrecy Act/Anti-Money Laundering Examination, which examination ended at or around the same time Taft commenced her employment with ABC.

11.     From the outset of her employment with ABC, Taft observed the subservient manner in which ABC's management treated its female employees, such as for example, having female office staff serve green tea to the male executives and have attractive female employees, including an attorney, positioned in chairs along the windows of the conference room as decoration during management meetings.

12.     Taft worked tirelessly to address the compliance and regulatory issues identified by the New York State and Federal Regulators as well as those she identified herself, but as time progressed, Taft came to realize that Yu viewed her not as the competent CCO she actually was, but rather as a woman who he could manipulate and/or disregard because of his chauvinistic view of women.

13.     For example, Yu, the most senior individual at ABC's offices in New York, which was the Bank's only branch in the United States, routinely engaged in the following discriminatory conduct toward Taft because of her gender:

- Repeatedly demeaning Taft in the workplace in front of other senior employees by making remarks about her physical appearance, such as stating that she was

3

"beautiful," "tall" and "blonde" and that he loved taking pictures next to her because of how she looked;

- Suggestively telling Taft that he would love to take her to Brazil, China and other places, giving Taft the impression that such a trip would not be entirely business-related;

- Telling Taft to repeat the Chinese phrase, "Wo I Knee," during a senior management lunch, which she did, causing all the Chinese attendees at the lunch to laugh and when Taft inquired as to what was so funny, then telling Taft that the phrase meant, "I love you," which was not something Taft felt or would ever say to her superior;

- Introducing Taft as a CCO, who is needed for passing good exams, and who is also very "pretty and blonde" to 12 members of ABC's Home Office in China who were visiting the New York Branch;

- Telling the Global Chief Compliance Officer (Taft's ultimate boss who she had not yet met), located in China, at the end of a group meeting to hold a separate meeting with Taft and then telling him, "I hope you enjoy this meeting. Natasha is very pretty and pleasant to look at;"

- Telling Taft, "You remind me of a Russian spy. You're so pretty and blonde;"

- Dismissing Taft's valid compliance and regulatory concerns and changing the subject to Taft's looks and appearance; and

- In addition to Yu's conduct, Joe Franzese, the Chief Financial Officer, also demonstrated ABC's discriminatory view of women, as confirmed by his telling Taft, when she asked what certain men were laughing about in Chinese, "They're probably talking about your boobs."

The acts mentioned above are not all-inclusive, but instead are only examples of the gender

discrimination to which Taft was subjected.

14.     As part of her responsibilities, Taft recognized certain areas of regulatory and compliance concern and brought her concerns to the attention of Yu and other senior managers.

15.     Taft, however, encountered strong resistance from the all male management about addressing these problems, including being told that she was wrong and that there were no issues, which was incorrect and was motivated by ABC's discriminatory refusal to take Taft seriously because of her gender.

16.     Ultimately, ABC permitted Taft to address the most critical regulatory issue with the regulators, which Taft did in a memorandum to the Supervisory Manager of Foreign Financial Institutions of the Federal Reserve Bank of New York, dated November, 20, 2014, which referenced Taft's concerns regarding possible violations by ABC.

17.     The Federal Reserve Bank of New York responded by letter in February 2015, and concurred with the concerns raised by Taft in her letter.

18.     The issues that the Federal regulators raised in response to Taft's letter caused serious concerns for the Bank and caused ABC to create an internal team to address these issues before the next examination by the regulators.

19.     ABC's management blamed Taft for convincing them to talk to the regulators and sought to punish her for doing so, all of which was exacerbated by ABC's discriminatory belief that Taft, as a woman, should not have been in a position to create such issues for the Bank.

20.     ABC, thereafter, took adverse action against Taft that was frightening and intimidated to her, and which included, but was not limited to:

- Prohibiting Taft from communicating with the regulators or the attorneys that ABC retained in response to the letter from the federal regulators dated February 4, 2015, even though she was CCO and head of legal;

- Transferring certain of Taft's compliance responsibilities to its male Chief Financial Officer, who had no compliance experience;

- Prohibiting Taft from direct communication with the General Manager or from documenting her compliance concerns in writing;

- Questioning Taft's professional competence;

- Refusing to approve certain of Taft's decisions with respect to several critical compliance matters; and

- Pressuring Taft to terminate one of her investigators and an information technology consultant.

The acts mentioned above are not all-inclusive, but instead are only examples of the whistleblower discrimination Taft suffered as a result of her efforts to address compliance and regulatory issues existing at ABC.

21.     ABC's hostility toward Taft after the regulators were in contact with ABC in February 2015 was extremely threatening and intimidating to Taft and caused her to suffer severe emotional and physical distress, requiring Taft to seek medical attention.

22.     On April 1, 2015, ABC, in a further effort to punish and discriminate against Taft, abruptly and unjustifiably terminated Ricardo Mendoza, Taft's most senior Compliance Officer, despite a strong performance evaluation that Taft provided on March 27, 2015.

23.     By that point, Taft's emotional and physical condition had deteriorated so severely that she was required to apply for short term disability leave on or about April 6, 2015.

24.     On April 14, 2015, Taft filed a formal complaint of discrimination with Angela Lam of ABC's Human Resource Department, which was a protected activity of which ABC was aware.

25.     Taft received no response to her complaint from Lam.

26.     Taft also retained counsel who contacted ABC on or about April 15, 2015, which was another protected activity of which ABC was aware.

27.     Following Taft's retention of counsel, ABC commenced an investigation into Taft's complaint and was ultimately advised that, based upon the findings of the investigator, ABC rejected Taft's allegations of gender discrimination and whistleblower discrimination, which meant that ABC

would take no action in response to her concerns.

28.     Accordingly, Taft, once she was able to return to work, could expect to suffer the same hostile workplace that had caused her to require disability leave in the first place.

29.     Taft's disability leave was set to expire on June 5, 2015 and Taft was faced with the decision of whether or not she could return to the same workplace where she had been subjected to discrimination.

30.     Taft reasonably could not return to a place that brought back such terrible and painful experiences for her and, as a result, Taft was constructively discharged on June 5, 2015.

31.     As a result of ABC's unlawful conduct, Taft has suffered the adverse effects of discrimination and the quality of her life, self-esteem and self-respect have been adversely impacted because she was subjected to the intimidating and humiliating types of conduct described herein, for which Taft has been required to seek medical attention, all of which will continue into the future and remain a source of humiliation, anguish, and financial loss to Taft.

32.     Here, the acts of ABC were done with reckless indifference in the face of a perceived risk that its actions would violate Taft's protected rights under the New York City Human Rights Law, that, in addition to all the damages inflicted upon Taft and in addition to all the measures of relief to which Taft may properly be entitled herein, ABC should also be required to pay punitive

damages as punishment for its discriminatory conduct, in order to deter ABC and others similarly situated from engaging in such conduct in the future.

**AS AND FOR A FIRST CAUSE OF ACTION ON BEHALF OF TAFT AGAINST ABC FOR GENDER DISCRIMINATION IN VIOLATION OF CHAPTER I, TITLE 8, § 8-107(1)(a) OF THE ADMINISTRATIVE CODE OF THE CITY OF NEW YORK**

33.     Taft repeats, re-alleges and incorporates in full paragraphs 1 through 32 of this Complaint, as though fully set forth at length herein.

34.     The entirety of the acts which constitute and form this cause of action, as set forth above, all of which are deemed repeated and re-alleged herein, as though said paragraphs were specifically set forth herein, were perpetrated upon Taft while she was in the course of her employment with ABC.

35.     ABC treated Taft less well because of her gender and took adverse employment action against her, which culminated in her constructive discharge, all of which was permitted and condoned by ABC.

36.     Taft was caused to suffer financial loss and emotional injuries because of ABC discriminatory conduct in violation of Taft's human rights, and which impacted her emotional and physical health, career, well-being and the quality of her life.

37.     As a result of ABC's violation of the New York City Human Rights Law, Taft has required medical treatment in order to cope with the emotional and physical injuries inflicted upon her by ABC and continues to require and receive medical treatment for her injuries.

38.     The aforementioned acts of ABC constitute unlawful gender discrimination against Taft in violation of Chapter I, Title 8 of the Administrative Code of the City of New York, §8-107(1)(a) (referred to as The New York City Human Rights Law), which provides *inter alia*, that:

> It shall be unlawful discriminatory practice: (a) For an employer or an employee or agent thereof, because of the . . . gender . . . of any person to discriminate against such a person in compensation or in terms, conditions or privileges of employment.

39.     As a result of ABC's violation of the New York City Human Rights Law §8-107(1)(a), ABC is liable to Taft pursuant to §8-502(a) of said statute for "damages, including punitive damages," and pursuant to §8-502(f) of said statute for "costs and reasonable attorney's fees," as provided for under the law.

40.     As a proximate result of ABC's conduct, Taft has been adversely affected in her employment, career, well-being, the quality of her life and in her normal life's pursuits, and Taft believes ABC's conduct, complained of herein, has and will continue to have an irreparable effect upon her career and the quality of her life, all of which Taft alleges to be in the amount of Three Million ($3,000,000) Dollars.

41.     Here, the acts of ABC were so reprehensible and were done with reckless indifference in the face of a perceived risk that its actions would violate Taft's protected rights under the New York City Human Rights Law, that, in addition to all the damages inflicted upon Taft and in addition to all the measures of relief to which Taft may properly be entitled herein, ABC should additionally be required to pay punitive damages as punishment for its discriminatory conduct in the further amount of Five Million ($5,000,000) Dollars, in order to deter ABC and others similarly situated from engaging in such conduct in the future.

42.     Taft, therefore, seeks compensatory damages in the First Cause of Action, including, among other things, the emotional and physical harm inflicted upon her in the sum of Three Million ($3,000,000) Dollars, and an additional and further sum of Five Million ($5,000,000)Dollars for punitive damages, making a total of Eight Million ($8,000,000) Dollars in this First Cause of Action, plus the costs of this action as well as reasonable attorney's fees on this First Cause of Action based on the method as has been judicially established and accepted when attorney's fees are provided under the law, as well as pre-judgment interest to the full extent permitted under the law.

## AS AND FOR A SECOND CAUSE OF ACTION ON BEHALF OF TAFT AGAINST ABC FOR WHISTLEBLOWER DISCRIMINATION UNDER THE BANK SECRECY ACT, 31 U.S.C. §5328

43.     Taft repeats, re-alleges and incorporates in full paragraphs 1 through 32 of this Complaint, as though fully set forth at length herein.

44.     At all relevant times mentioned herein, as a branch of a foreign bank, ABC was a "financial institution" under The Bank Secrecy Act, pursuant to 31 U.S.C. §5312(a)(2).

45.     Taft providing information to the regulators regarding possible violations of various laws and regulations by ABC, including possible violations of The Bank Secrecy Act, was a protected activity of which ABC was aware.

46.     As a proximate result of her protected activity, ABC took hostile and egregious adverse employment action against Taft, culminating in her constructive discharge.

47.     The aforementioned acts of ABC constitute unlawful whistleblower discrimination against Taft in violation of The Bank Secrecy Act, 31 U.S.C. §5328(a), which provides, *inter alia*, that:

> No financial institution or nonfinancial trade or business may discharge or otherwise discriminate against any employee with respect to compensation, terms, conditions, or privileges of employment because the employee . . . provided information to the Secretary of the Treasury, the Attorney General, or any Federal supervisory agency regarding a possible violation of any provision of this subchapter . . . by the financial institution or nonfinancial trade or business or any director, officer, or employee of the financial institution or nonfinancial trade or business.

48.     As a proximate result of ABC's conduct, Taft has been adversely affected in her employment, career, well-being, the quality of her life and in her normal life's pursuits, and Taft believes ABC's conduct, complained of herein, has and will continue to have an irreparable effect

upon her career and the quality of her life.

49.     Taft, therefore, seeks all remedies that are available to her under the FIRREA, including "compensatory damages," 31 U.S.C. §1831j(c)(2), in an amount to be determined at trial.

### AS AND FOR A THIRD CAUSE OF ACTION ON BEHALF OF TAFT AGAINST ABC FOR WHISTLEBLOWER DISCRIMINATION UNDER THE FINANCIAL INSTITUTIONS REFORM, RECOVERY, AND ENFORCEMENT ACT, 12 U.S.C. §1831j

50.     Taft repeats, re-alleges and incorporates in full paragraphs 1 through 32 of this Complaint, as though fully set forth at length herein.

51.     At all relevant times mentioned herein, as a branch of a foreign bank, ABC was an "insured depository institution" covered by The Financial Institutions Reform, Recovery, and Enforcement Act ("FIRREA"), pursuant to 12 U.S.C. §1813(c)(3).

52.     Taft providing information to the Fed regarding possible violations of various laws and regulations by ABC, including possible violations of The Bank Secrecy Act, 31 U.S.C. § 5311, *et seq.*, and other federal regulations, was a protected activity of which ABC was aware.

53.     As a proximate result of her protected activity, ABC took hostile and egregious adverse employment action against Taft, culminating in her constructive discharge.

54.     The aforementioned acts of ABC constitute unlawful whistleblower discrimination against Taft in violation of the FIRREA, 12 U.S.C. §1831j(a)(1), which provides, *inter alia*, that:

> No insured depository institution may discharge or otherwise discriminate against any employee with respect to compensation, terms, conditions, or privileges of employment because the employee . . . provided information to any Federal banking agency or to the Attorney General regarding (A) a possible violation of any law or regulation.

55.     As a proximate result of ABC's conduct, Taft has been adversely affected in her employment, career, well-being, the quality of her life and in her normal life's pursuits, and Taft believes ABC's conduct, complained of herein, has and will continue to have an irreparable effect upon her career and the quality of her life.

56.     Taft, therefore, seeks all remedies that are available to her under the FIRREA, including "compensatory damages," 12 U.S.C. §1831j(c)(2), in an amount to be determined at trial.

## PRAYER FOR RELIEF

**WHEREFORE,** Taft demands judgment against ABC on the First Cause of Action in the sum of Three Million Dollars ($3,000,000) in compensatory damages and the further and additional sum of Five Million Dollars ($5,000,000) in punitive damages for a total of Eight Million Dollars ($8,000,000) as is permitted under The New York City Human Rights Law; on the Second Cause of Action, compensatory damages in an amount to be determined at trial; and on the Third Cause of Action, compensatory damages in an amount to be determined at trial; plus pre-judgment interest, the costs of this action and reasonable attorney's fees as is permitted under the law, and for such

14

other and further relief as this Court may deem just and proper.

## <u>JURY DEMAND</u>

The Plaintiff hereby demands a trial by jury.

**SCHWARTZ & PERRY, LLP**
*Attorneys for Plaintiff*

By: _____
DAVIDA S. PERRY (1879)
MATTHEW T. SCHATZ (5979)
295 Madison Avenue
New York, New York 10017
(212) 889-6565

15