UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------X
                                               :

NATASHA TAFT,                      :

                     Plaintiff,    :

                                      :

                -v-                 :

                                      :

AGRICULTURAL BANK OF CHINA LTD.,  :

                                    :

                   Defendant.   :

                                    :

------------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 1/6/16

15 Civ. 5321 (PAE)

<u>OPINION & ORDER</u>

**PAUL A. ENGELMAYER, District Judge:**

     This case involves allegations of anti-whistleblower retaliation and gender-based

discrimination. Plaintiff Natasha Taft alleges that she was employed by defendant Agricultural

Bank of China Ltd. ("ABC") as chief compliance officer in the New York office until she was

constructively discharged after under a year of employment. She alleges that she was subjected

to frequent sexually charged comments and gender-related mistreatment, and, further, that ABC

retaliated against her after she brought certain issues to the attention of the Federal Reserve Bank

of New York ("FRBNY").

     ABC has now moved to dismiss Taft's whistleblower claim. For the reasons that follow,

the motion to dismiss is granted with leave to replead.

**I.    Background[1]**

    **A.    Facts**

     Taft was employed by ABC between August 2014 and June 5, 2015, when, she alleges,

she was constructively discharged. Am. Compl. ¶ 3. During this time, she was the chief

---

[1] For the purpose of resolving the motion to dismiss, the Court assumes all well-pled facts in the
Amended Complaint, Dkt. 24 ("Am. Compl."), to be true, drawing all reasonable inferences in

compliance officer and head of legal and compliance at the New York branch. *Id.* ¶ 6. Taft had 18 years of experience in compliance and anti-money laundering. *Id.* ¶ 8. As chief compliance officer, she reported to Jason Zhang, the branch's deputy general manager; Ming Yu was the general manager. *Id.* ¶ 7. During this time, Taft was the only "C" level female (referring to corporate management) and the only non-Chinese female manager. *Id.* ¶ 9.

In her capacity as chief compliance officer, Taft alleges, she identified certain "areas of regulatory and compliance concerns," which she shared with Yu and other senior managers. *Id.* ¶ 14. These persons "strongly resisted Taft's effort to address these concerns with the regulators" and told Taft "she was wrong and that there were no issues," a brush-off that Taft claims was motivated by gender discrimination. *Id.* ¶ 15. However, Taft was eventually "permitted" on November 12, 2014 to submit a memorandum to the Supervisory Manager of Foreign Financial Institutions of the FRBNY conveying some of the concerns Taft had raised with her supervisors. *Id.* ¶ 16.[2]

In her cover email to the FRBNY, to which the memo was attached, Taft stated that she "had to go through some lengthy internal discussions before finalizing the memo." Memo at 1.[3]

---

favor of the plaintiff. *See Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012). References herein to "Tr." refer to the preliminary transcript of argument, provided by the court reporters' office.

[2] The memo itself is dated November 10, *see* Dkt. 33 ("Haviv Decl."), Ex. B ("Memo"), at 3, and the Amended Complaint alleges it was sent November 20, *see* Am. Compl. ¶ 16, but the email that transmitted the memo to the FRBNY is dated November 12, *see* Memo at 1. *See 380544 Canada, Inc. v. Aspen Tech., Inc.*, 544 F. Supp. 2d 199, 215 (S.D.N.Y. 2008) ("Where the plaintiff's allegations are contradicted by a document that the complaint incorporates by reference, the document controls.").

[3] Although not attached to the Amended Complaint, the memo is cognizable on a motion to dismiss because it is both integral to the complaint and incorporated by reference. *See generally Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152–53 (2d Cir. 2002) ("'[T]he complaint is deemed to include any written instrument attached to it as an exhibit or any statements or

Taft added:  "I included my concerns . . . and the results of my due diligence for industry practices."  *Id.*  Her cover email concluded:  "I really appreciate your guidance and support so we can implement appropriate controls."  *Id.*

The memo begins by referring to a prior conversation between Taft and the FRBNY's Supervisory Manager.  *Id.* at 3.  The memo concerns the collection of customer information related to certain transactions.  Specifically, it expresses "concerns" and seeks "guidance" about the Compliance Department's discovery of a "number of transactions related to clearing US Dollars for ABC's Trade related customers for Letters of Credit and Collection transactions," with respect to which the customers "are not identified on [the] payment messages."  *Id.* at 3.  The memo states:  "Compliance believes this represents risk for adequate [Office of Foreign Assets Control] screening or [anti-money laundering] monitoring controls."  *Id.* at 4.

In seeking the FRBNY's guidance on this issue, the memo reports that "Compliance . . . reached out to other banks, consulting firms and the regulators to better understand what the regulatory expectations are and what the industry practices are with respect to such transactions."  *Id.*  The memo adds that "Compliance was not able to identify specific regulation with respect to such scenarios," although it identified "various methods" in the industry for addressing the issue.  *Id.*  The memo concludes by stating that "Trade Finance is a new frontier for money laundering and the regulators are taking a very firm approach to ensure clearing banks have adequate policies and controls," and, therefore, that "we seek your guidance to further address this issue."  *Id.* at 5.

---

documents incorporated in it by reference.'  Even where a document is not incorporated by reference, the court may nevertheless consider it where the complaint 'relies heavily upon its terms and effect,' which renders the document 'integral' to the complaint." (quoting *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995) (per curiam) (citations omitted)).

Taft also alleges that she had "several conversations with the Supervisory Manager both before and after sending the memorandum" to the FRBNY, during which she "discussed her concerns about possible violations of law by ABC."  Am. Compl. ¶ 17.

In February 2015, Taft alleges, the FRBNY responded to the memo by letter, *id.* ¶ 18, "caus[ing] serious concerns for ABC that had to be addressed before the next examination by the regulators," *id.* ¶ 19.  ABC's management then "became furious at Taft for the Fed's response," *id.* ¶ 20, and took various adverse actions against her.  These included:  (1) prohibiting her from communicating with regulators, outside attorneys, and ABC's general manager; (2) transferring her job responsibilities to a person with no compliance experience; (3) disparaging her and blaming her for the regulators' response; (4) requiring her to report to the chief financial officer, which allegedly harmed her independence and ability to do her job; (5) refusing to approve certain of her decisions; and (6) pressuring her to terminate other employees.  *Id.* ¶ 22.  Ultimately, ABC allegedly sought to punish Taft by terminating her most senior compliance officer, even after Taft had given the officer a strong performance evaluation.  *Id.* ¶ 24.

These alleged adverse actions caused Taft "severe emotional and physical distress," *id.* ¶ 23, requiring medical attention and ultimately causing Taft to apply for short-term disability leave on or about April 6, 2015, *id.* ¶ 25.  Taft soon after filed a formal complaint of gender and whistleblower discrimination with ABC's human resources department, *id.* ¶ 26, and retained counsel, *id.* ¶ 28.  ABC investigated Taft's complaint and ultimately rejected her allegations.  *Id.* ¶ 29.  With her disability leave set to expire on June 5, 2015, Taft decided not to "return to the same workplace where she had been subjected to discrimination."  *Id.* ¶ 31.

### B.    Procedural History

On July 9, 2015, Taft filed an initial Complaint.  Dkt. 1 ("Compl.").  It brought three claims: (1) gender discrimination in violation of the New York City Human Rights Law, *see id.*

4

¶¶ 33–42; (2) whistleblower discrimination under the Bank Secrecy Act ("BSA"), 31 U.S.C. §

5328, *see id.* ¶¶ 43–49; and (3) whistleblower discrimination under the Financial Institutions

Reform, Recovery, and Enforcement Act ("FIRREA"), 12 U.S.C. § 1831j, *see id.* ¶¶ 50–56.

On September 18, 2015, ABC moved to dismiss the second and third claims.  Dkt. 16.

On October 6, 2015, Taft filed an amended complaint, which dropped the FIRREA claim but

retained the others.  Taft seeks $8 million in compensatory and punitive damages.

On October 30, 2015, ABC again moved to dismiss the BSA whistleblower claim.  Dkt.

27.  ABC submitted a memorandum of law in support of its motion, Dkt. 34 ("ABC Br."), and a

declaration of Kimberly A. Haviv, Dkt. 33 ("Haviv Decl."), and attached exhibits.  On

November 13, 2015, Taft submitted a memorandum of law in opposition, Dkt. 39 ("Taft Br."),

and a declaration of Brian Heller, Dkt. 36 ("Heller Decl."), and attached exhibits.  On November

20, 2015, ABC submitted a reply brief.  Dkt. 43 ("ABC Reply").[4]  On December 11, 2015, the

Court held argument.

## II.   Legal Standards on a Motion to Dismiss

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough

facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S.

544, 570 (2007).  A claim has "facial plausibility when the plaintiff pleads factual content that

allows the court to draw the reasonable inference that the defendant is liable for the misconduct

alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  A complaint is properly dismissed where,

as a matter of law, "the allegations in a complaint, however true, could not raise a claim of

entitlement to relief."  *Twombly*, 550 U.S. at 558.

---

[4] The parties' briefs and declarations were filed publicly in redacted form in accordance with the
Court's orders.  *See* Dkts. 29, 38, 42.  The above-referenced dates reflect the dates on which the
Court received the materials, not when those materials were publicly posted on ECF.

In considering a motion to dismiss, a district court must "accept[] all factual claims in the complaint as true, and draw[] all reasonable inferences in the plaintiff's favor." *Lotes Co. v. Hon Hai Precision Indus. Co.*, 753 F.3d 395, 403 (2d Cir. 2014) (quoting *Famous Horse Inc. v. 5th Ave. Photo Inc.*, 624 F.3d 106, 108 (2d Cir. 2010)) (internal quotation marks omitted).  However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678.  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*  "[R]ather, the complaint's *factual* allegations must be enough to raise a right to relief above the speculative level, *i.e.*, enough to make the claim plausible." *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010) (quoting *Twombly*, 550 U.S. at 555, 570) (internal quotation marks omitted) (emphasis in *Arista Records*).

## III.    Discussion

Taft's whistleblower protection claim arises under a provision of the BSA, codified at 31 U.S.C. § 5328(a), which provides:

> No financial institution or nonfinancial trade or business may discharge or otherwise discriminate against any employee with respect to compensation, terms, conditions, or privileges of employment because the employee (or any person acting pursuant to the request of the employee) provided information to the Secretary of the Treasury, the Attorney General, or any Federal supervisory agency regarding a possible violation of any provision of this subchapter or section 1956, 1957, or 1960 of title 18, or any regulation under any such provision, by the financial institution or nonfinancial trade or business or any director, officer, or employee of the financial institution or nonfinancial trade or business.

In other words, § 5328(a) protects (1) employees of financial institutions[5] who (2) provide information regarding a possible violation of specified laws and regulations by the financial

---

[5] Section 5328(a), however, does not apply "with respect to any financial institution or nonfinancial trade or business which is subject to section 33 of the Federal Deposit Insurance Act, section 213 of the Federal Credit Union Act, or section 21A(q) of the Home Owners' Loan Act."  31 U.S.C. § 5328(e).

institution, its directors, officers, or employees, to (3) the Treasury Secretary, Attorney General, or "any Federal supervisory agency," from (4) employment-related discrimination (5) because they made such a report.[6]

ABC's arguments for dismissal primarily focus on the second element—requiring Taft to have provided information regarding a possible violation of an enumerated law or regulation.[7] First, ABC argues that Taft herself did not provide any information because she acted on ABC's behalf; ABC argues that it, not Taft, provided the information in the memo sent to the FRBNY. Second, ABC argues that the information in the memo did not regard a possible violation of one of the specified laws or regulations. Third, ABC argues that Taft has inadequately pled causation, *i.e.*, that she suffered adverse employment action *because* of the memo to the FRBNY. The Court addresses these arguments in turn.

---

[6] Section 5328(a) thus represents a variant of the anti-retaliation provisions of familiar statutes such as Title VII and the Fair Labor Standards Act, which require a showing of (1) protected activity known to the defendant, (2) adverse employment action, and (3) a causal connection between the two. *See Simas v. First Citizens' Fed. Credit Union*, 170 F.3d 37, 44 (1st Cir. 1999) (relying on "analogous statutes" to provide the burdens of proof, otherwise unspecified in the Federal Credit Union Act ("FCUA")). The Court assumes that the familiar burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) therefore also applies to claims under § 5328(a). *See Balko v. Ukrainian Nat. Fed. Credit Union*, No. 13 Civ. 1333 (AJP), 2014 WL 1377580, at *10–11 (S.D.N.Y. Mar. 28, 2014) (applying that framework to an FCUA retaliation claim).

[7] It appears uncontested that ABC is a financial institution covered by the BSA, that Taft was an ABC employee, that the FRBNY is a "Federal supervisory agency," and that Taft was subjected to materially adverse employment actions. The BSA does not itself define the term "Federal supervisory agency." *See* 31 U.S.C. § 5312. The Court assumes *arguendo* that the FRBNY, as a member bank within the Federal Reserve System, is a "Federal supervisory agency" within the meaning of the statute. In the event Taft repleads a BSA claim which ABC moves to dismiss, the Court directs the parties to address that issue.

1.      **Did Taft Act on Behalf of ABC?**

a.      *Are compliance personnel exempt from coverage under the BSA?*

A threshold question of statutory construction is whether the whistleblower provision at issue, 31 U.S.C. § 5328, applies to acts of retaliation against compliance officers who provided information about their banks that their job duties required them to report.  Section 5328 has been the subject of few reported decisions, and the holdings in several have been narrow and irrelevant to the case at hand.  *See, e.g.*, *Schroeder v. Greater New Orleans Fed. Credit Union*, No. 09 Civ. 3647, 2010 WL 4723357, at *12 (E.D. La. Nov. 15, 2010), *vacated and remanded on other grounds*, 664 F.3d 1016 (5th Cir. 2011) (BSA provision does not apply to federal credit unions covered by the Federal Credit Union Act); *Cooney v. Brandywine Asset Mgmt.*, No. 98 Civ. 5537, 1998 WL 966007, at *1 (E.D. Pa. Dec. 22, 1998) (provision does not apply to reports made to "private industry associations").  Accordingly, the parties dwell heavily on the most apposite decision, *Wolf v. Pacific National Bank*, No. 09 Civ. 21531, 2010 WL 5888778 (S.D. Fla. Dec. 28, 2010), *report and recommendation adopted sub nom. Wolf v. Pac. Nat. Bank N.A.*, 2011 WL 772853 (S.D. Fla. Feb. 28, 2011).

In *Wolf*, the plaintiff, a bank president, alleged that he had been terminated after he reported purportedly illegal activities to the bank's BSA/anti-money-laundering department and board of directors, which complaints were ultimately relayed to federal regulators.  *See id.* at *2– 3, *9.  The *Wolf* court's discussion of the BSA was limited to noting that the BSA did not apply to Wolf, because the bank he had served as president was an "insured depository institution" to which the separate (but similar) whistleblower provision of the Federal Deposit Insurance Act

("FDIA") applied.[8]  *See id.* at *11 (citing 31 U.S.C. § 5328(e) ("[t]his section shall not apply with respect to any financial institution or nonfinancial trade or business which is subject to section 33 of the [FDIA]")).  But in explaining why Wolf's FDIA claims also failed, the court held that "a plaintiff does not engage in protected activity by disclosing violations of law as part of his job responsibilities," and that bank president Wolf's "actions were in furtherance of his own fiduciary obligations as part of his job responsibilities."  *Id.* at *10.

Relying on *Wolf*, ABC argues that, because Taft's job duties "explicitly included ensuring that ABC operated in compliance with applicable law and working with ABC and its regulators to address questions," Taft could not have been acting as a whistleblower when she filed the report with the FRBNY.  ABC Br. 11.  Taft, for her part, attempts to distinguish *Wolf* by citing *Balko v. Ukrainian National Federal Credit Union*, No. 13 Civ. 1333 (AJP), 2014 WL 1377580 (S.D.N.Y. Mar. 28, 2014).  *Balko* involved a claim under the separate (but similar) whistleblower provision of the Federal Credit Union Act ("FCUA").  *See* 12 U.S.C. § 1790b. *Balko* rejected *Wolf* by noting that *Wolf*, and the cases on which it relied, predated the 2012 amendment to the Whistleblower Protection Act ("WPA").  Generally, the WPA protects federal civil servants from employment-related discrimination for making any disclosure which the employee reasonably believes evidences, *inter alia*, a violation of law, rule, or regulation.  5 U.S.C. §2302(b)(8).  Certain statutes, including the FDIA, the statute at issue in *Wolf*, expressly incorporate the "legal burdens of proof that prevail" under the WPA.  12 U.S.C.A. § 1831j.  The 2012 WPA amendment clarified that an employee is not excluded from whistleblower protection

---

[8] It appears that ABC is not such an institution.  At argument, ABC's counsel explained that the original Complaint contained an FDIA claim, *see* Compl. ¶¶ 50–56, which was voluntarily dismissed because ABC is not "federally insured," as required for that statute to apply.  Tr. 19.

simply because her "disclosure is made during the normal course of duties."  5 U.S.C. §
2302(f)(2).  With the 2012 amendment to the WPA, "Congress made crystal clear its intent that
*any* whistleblower who reports misconduct via one of the enumerated channels be protected."
*Leshinsky v. Telvent GIT, S.A.*, 942 F. Supp. 2d 432, 449 (S.D.N.Y. 2013) (emphasis in original).
ABC counters that *Balko* is inapposite—and that *Wolf* remains good law—because the 2012
amendments to the WPA do not apply to the BSA, a separate statute with its own whistleblower
provision that does not incorporate the WPA and that was not subject to a similar amendment.

In the Court's assessment, ABC's argument based on *Wolf* is unpersuasive, insofar as
ABC would categorically exempt from BSA protection persons (like compliance officers such as
Taft) whose job duties included reporting possible violations.  First, it is worth noting that, like
the BSA, the statute at issue in *Balko*—the FCUA—also does not incorporate the WPA;
nevertheless, the court relied on the 2012 WPA amendment for guidance.  Furthermore, *Wolf*
itself did not reflect a consensus view:  Even before the 2012 WPA amendment on which *Balko*
relied, various cases (some cited in *Balko*) had applied whistleblower protections under the
FCUA to employees whose responsibilities included compliance.  *See Balko*, 2014 WL 1377580,
at *19 n.35 (citing *Averett v. Chi. Patrolmen's Fed. Credit Union*, No. 06 Civ. 4606, 2007 WL
952034, at *1 (N.D. Ill. Mar. 27, 2007); *Fain v. Transmission Builders Fed. Credit Union*, No.
04 Civ. 354, 2005 WL 2126778 at *1, *3 (S.D. Ind. Sept. 1, 2005); *Garrett v. Langley Fed.
Credit Union*, 121 F. Supp. 2d 887, 892–93 (E.D. Va. 2000); *Simas v. First Citizens' Fed. Credit
Union*, 996 F. Supp. 76, 80–81 (D. Mass. 1998), *vacated on other grounds by* 170 F.3d 37 (1st
Cir. 1999)); *see also Johnson v. Dep't of Health & Human Servs.*, No. DC-1221-00-0199-W-1,
2000 WL 1310714, at *4 (M.S.P.B. Aug. 21, 2000) ("The [Merit Systems Protection Board] has
long held that the definition of a 'protected disclosure' [under the WPA] includes disclosures

made by employees as part of the performance of their duties."); *Askew v. Dep't of Army*, No. CH-1221-99-0555-W-1, 2001 WL 760605, at *3 (M.S.P.B. June 28, 2001) (limiting one of the key contrary decisions to its "unique facts").

For several reasons, the Court similarly holds that an employee whose duties included compliance and regulatory reporting is not precluded from stating a retaliation claim under the BSA merely because the retaliation was in response to a report that the employee's job description required her to make.

First and foremost, the BSA's text does not support categorically excluding such personnel from coverage. The statute instead broadly applies to "any employee," 31 U.S.C. § 5328(a), who provides information regarding certain statutory or regulatory violations to a covered agency, subject to only two limited exceptions, not applicable here, for any employee who "deliberately causes or participates in the alleged violation of law or regulation," or who "knowingly or recklessly provides substantially false information." *See id.* § 5328(d). There is, therefore, no textual charter for categorically excluding compliance officers and their ilk from protection for causing such reports to be made.

Second, categorically excluding compliance officers from protection would create a loophole inconsistent with the statute's evident purposes. It would permit employers to retaliate against a class of employees uniquely likely to possess, and to be in a position to effectively report, information regarding possible violations of law that the covered entity does not wish to expose. Such an exclusion could chill the reporting of violations of the law that § 5328(a) clearly aims to encourage.

Third, in the analogous Title VII context, the Second Circuit has recently declined to adopt the "manager rule"—the rule that "complaints of discrimination within the scope of a

manager's job duties are not protected activities." *Littlejohn v. City of New York*, 795 F.3d 297, 317 n.16 (2d Cir. 2015).  This holding offers instructive guidance, as courts have examined Title VII precedent in construing "comparably-phrased" but rarely litigated whistleblower provisions like § 5328.  *See Simas*, 170 F.3d at 43 (looking to Title VII in interpreting the FCUA).

Fourth and finally, aspects of the legislative history of the 2012 amendments to the WPA, on which *Balko* relied, belie ABC's theory that the WPA did not, until those amendments, cover compliance personnel.  This history instead suggests that Congress may have believed that the WPA *already* permitted such employees to claim such whistleblower protection, and was enacting the amendments to respond to those who had wrongly read the WPA otherwise.  *See* S. Rep. 112-155, 4-5, 2012 U.S.C.C.A.N. 589, 593 (criticizing the Federal Circuit and Merit Systems Protection Board for "undermin[ing] the WPA's intended meaning" and its "plain language").

To the extent that ABC seeks to read an exception for compliance personnel into the BSA, the Court, therefore, declines to do so.

> b.    *Did Taft, as opposed to ABC, "provide[] information" to the FRBNY?*

Although the BSA's whistleblower provision does not categorically exempt compliance personnel, it does not follow that every communication by a compliance officer about a possible violation of law by the bank or an officer or employee falls within the scope of the statute.  The statute's coverage of all "employees" who "provide[]" certain information must be construed in context.  *See generally King v. Burwell*, 135 S. Ct. 2480, 2489 (2015); *Cohen v. JP Morgan Chase & Co.*, 498 F.3d 111, 118 (2d Cir. 2007).  Banks not infrequently self-report potential violations of law by their personnel to regulators.  Various personnel in the bank may be party to the process of transmitting those reports.  An administrative assistant who, for example, on a

bank's behalf, faxes to a regulator a bank-approved report of a violation of law would appear to fall outside the intended scope of the statute, even though she is a bank "employee" and her act of faxing was what physically "provided" the report to the regulator. Likewise, given the nature of their job duties, it often falls to compliance personnel to communicate reports to regulators that a bank affirmatively has determined to make. A bank itself, through its ranking officers, may wholeheartedly support, and approve or control the text of, such a report by a compliance officer on its behalf.

A whistleblower-protection statute such as § 5328(a) is plainly not intended to apply to persons who merely serve as the bank's chosen conduits for making such reports on the bank's behalf. Section 5328(a) instead anticipates that, for an act of "provid[ing] information" about a possible violation of law to be protected as a whistleblower communication, the bank employee must have acted *independently* of the bank. Put in statutory terms, when the employee does not act independently of the bank, but merely conveys a bank-approved report, it is the bank, and not the "employee" as required by § 5328(a), that has "provided" the information.

The precedents on which ABC relies in arguing that compliance personnel are categorically excluded from the BSA's protection for reports that fall within their job descriptions—a theory the Court has rejected—may be read as reflecting this narrower point: that for her report to a regulator to be covered by the BSA, a bank officer must have acted independently, not with the bank's approval or authorization. For instance, in *Sasse v. U.S. Department of Labor*, 409 F.3d 773 (6th Cir. 2005), the Sixth Circuit noted that "the WPA 'is intended to protect government employees who risk their own personal job security for the advancement of the public good.'" *Id.* at 779–80 (quoting *Willis v. Dep't of Agric.*, 141 F.3d

1139, 1144 (Fed. Cir. 1998)).[9]  In contrast, compliance employees who, under a bank-employer's direction, convey reports to regulators do not run such a risk.  Put colloquially, it is not whistleblowing where the whistle is effectively blown by the employer.[10]

On ABC's motion to dismiss, the issue, then, is whether the Amended Complaint adequately pleads that the report to the FRBNY was Taft's, as opposed to a communication directed by ABC as to which Taft merely served as the signatory or transmittor.  ABC argues, based on the pleadings and other cognizable materials, that it, not Taft, was the provider of the information in question to the FRBNY.  ABC notes that (1) the memo to the FRBNY was written on ABC letterhead, sent from Taft's ABC email account, and repeatedly used the word "we" to refer to the senders; (2) Taft's cover email referred to "lengthy internal discussions" within the bank that preceded the report; and (3) the Amended Complaint expressly pleads that the memo was sent with ABC's permission.  *See* ABC Br. at 4, 8–9 (citing Am. Compl. ¶ 16).[11]

---

[9] The same concept logically applies, under the BSA, with respect to employees of covered financial institutions.

[10]  To be covered under § 5328(a), the employee's report must be to a regulator specified in the statute.  Section 5328(a) thus contrasts with anti-retaliation statutes which protect internal complaints.  *See, e.g.*, 18 U.S.C. § 1514A(a)(1)(C) (covering reports of possible securities violations to a "person with supervisory authority over the employee"); 42 U.S.C. §2000e-3(a) (making it unlawful to discriminate against an employee "because he has opposed" unlawful employment practices).

[11] ABC's brief embellishes on this approval, representing that ABC gave "express instructions" to Taft on how to engage with the FRBNY, ABC Br. 9, and that the memo was "drafted with the input of multiple ABC employees," *id.* at 4.  Because those facts are contained within neither the Amended Complaint nor the materials cognizable on ABC's motion to dismiss, the Court does not consider these factual representations in resolving the motion.  Similarly, in her brief, Taft claims that the memo was a "much softer and more watered down version than the draft that Taft initially proposed sending."  Taft Br. 9.  This allegation, too, does not appear in the Amended Complaint and is not cognizable on a motion to dismiss.  *See Ruotolo v. Fannie Mae*, 933 F. Supp. 2d 512, 515 n.1 (S.D.N.Y. 2013) ("[A] court should not consider new facts alleged in moving papers.").

Reviewing Taft's pleadings and the text of her communications with the FRBNY, the Court holds with ABC.  These materials, considered as a whole, do not make plausible the claim—and the Amended Complaint nowhere overtly makes such a claim—that the report to FRBNY was an independent act of Taft's.  On the contrary, the Amended Complaint itself alleges that ABC "permitted" her to submit the memo to the FRBNY.  *See* Am. Compl. ¶ 16.  And Taft's counsel admitted at argument that ABC "approved" the memo as submitted.  *See* Tr. at 24–25.  Notably, Taft's cover email and the memo to the FRBNY reflect such approval:  Taft states that the memo arose from "lengthy internal discussions" about the subject, Memo at 1, and in multiple places the memo uses the first-person plural ("we") rather than the singular ("I") to denote the author.

To be sure, there are allegations in the Amended Complaint to the effect that ABC initially tried to prevent Taft from saying anything to the FRBNY, and that Taft only "[u]ltimately" received permission to send the memo, after internal discussions.  Am. Compl. ¶ 16.  And Taft's cover email refers to "my concerns," *i.e.*, Taft's concerns, rather than "our" or "ABC's" concerns.  Memo at 1.  These cues suggest that Taft took the lead within ABC in pushing for the report to be made and persuading her superiors to approve it.  But, as noted, *see supra* note 10, § 5328(a) does not cover retaliation against an employee for internal communications or dissent, but only for the employee's report of information to a regulator.  And Taft's pleadings, and the memo itself, are inconsistent with the thesis that she made an independent report to the FRBNY, as opposed to doing so with ABC's permission and approval.

Taft's claim under the BSA must therefore be dismissed.  The dismissal, however, is without prejudice to Taft's right to replead.  It may be that the memo itself is unavoidably ABC's, not Taft's.  But the Court is mindful that Taft, in preparing the Amended Complaint, did

not have the benefit of the Court's articulation here of the governing standards under § 5328(a). And it may be that there are facts that Taft can plead, which she has not pled to date,[12] that would make plausible the claim that the report to the FRBNY, notwithstanding the compelling indications that ABC approved and authorized it to be made, was in fact Taft's, not the bank's.

### 2. Did Taft Provide Information Regarding a Possible Violation of the Enumerated Laws and Regulations?

ABC's second major argument for dismissal is that Taft fails to allege that she provided information regarding a possible violation of any law or regulation specified within 31 U.S.C. § 5328(a).

The BSA makes it unlawful to retaliate against an employee for providing information regarding a possible violation of enumerated laws—namely, "any provision of this subchapter [*i.e.*, 31 U.S.C. §§ 5311–5332] or section 1956, 1957, or 1960 of title 18"—and the regulations promulgated thereunder. *See* 31 U.S.C. § 5328(a). Taft argues that, by providing the memo to the FRBNY, she provided information regarding possible violations of 31 U.S.C. § 5318(h)— which requires each financial institution to establish anti-money laundering programs, including "the development of internal policies, procedures, and controls"—and of the BSA's so-called "Travel Rule," codified at 31 C.F.R. § 1010.410(f) (formerly 31 C.F.R. § 103.33(g))—which requires, *inter alia*, an intermediary financial institution to provide certain information regarding the transmittor when it passes along a transmittal order involving funds in excess of $3,000. *See* Taft Br. 7.

---

[12] The Amended Complaint does allege that Taft "had several conversations with the [FRBNY] Supervisory Manager both before and after her memorandum, where she openly discussed her concerns about possible violations of law by ABC, and Taft made ABC aware of those conversations." Am. Compl. ¶ 17. However, this allegation is too vague and conclusory to assist Taft in resisting dismissal.

As ABC notes, the memo that Taft sent to the FRBNY did not identify any statute or regulation that was or may have been violated.  But the BSA does not require such a plain statement:  It covers employees who merely provide *information* regarding a *possible* violation, and applies to lay employees who may be untutored in the law.  *See Leshinsky*, 942 F. Supp. 2d at 443 n.2 ("[I]t would . . . be unfair to expect a plaintiff seeking to inform his boss of financial misbehavior to have a working knowledge of the United States Code.").  It is, however, essential under the BSA that the report, rather than merely expressing a grievance or noting a suboptimal practice, suggest a violation of a provision carrying "the force of law."  *Segarra v. Fed. Reserve Bank of N.Y.*, 17 F. Supp. 3d 304 (S.D.N.Y. 2014), *aff'd*, 802 F.3d 409 (2d Cir. 2015).

Attempting to satisfy this standard, Taft argues that the memo implicated the Travel Rule, which requires intermediary banks to transmit to the "next receiving financial institution" certain information including, *inter alia*, the names, addresses, and account numbers of customers whose orders they are processing, if they receive such information from the sender.  31 C.F.R. § 1010.410(f)(2).  The memo to the FRBNY notes that, as to certain transactions, only the originating and receiving banks were receiving that sort of "detailed transaction information," but that ABC, the intermediary bank, was not.  Memo at 3.  Taft, in her brief, repeatedly characterizes ABC's non-receipt and non-recordation of this customer information as reflecting merely a "loophole" in the law.  *See* Taft Br. 2, 4, 8, 12, 13.[13]  The memo to FRBNY expressed concern that this loophole created "risk for adequate [Office of Foreign Assets Control] screening or [anti-money-laundering] monitoring controls."  Memo at 4.  The memo further

---

[13] In the event Taft repleads a BSA retaliation claim which ABC moves to dismiss, the Court would benefit from a clearer explication of the legal obligations imposed on banks by the Travel Rule, including whether an intermediary bank that does not receive such information has any affirmative obligation to obtain it.

noted that "regulators are taking a very firm approach to ensure clearing banks have adequate policies and controls."  *Id.* at 5.

Attempting now to bring the memo to FRBNY within the ambit of § 5328(a), Taft characterizes it as "a devastating indictment of ABC's practices."  Taft Br. 12.  Consistent with this, the Amended Complaint alleges, generally, that the FRBNY's response several months later "raised serious concerns for ABC that had to be addressed before the next examination by the regulators."  Am. Compl. ¶ 19; *see also Balko*, 2014 WL 1377580, at * 19 (noting that "events that followed [plaintiff's] disclosures," *i.e.*, the regulator's responses, demonstrated that her disclosures concerned possible violations of law or regulation).

ABC counters that Taft's cover email and the memo are replete with language to the effect that Taft and/or ABC were merely seeking "guidance."  *See* ABC Br. 11.  ABC argues that merely seeking guidance or advice as to a banking practice is insufficient, on its own, to suggest a possible violation of law.  *See* ABC Br. 11–12 (citing *Hill v. Mr. Money Fin. Co.*, 309 F. App'x 950 (6th Cir. 2009)).  In *Hill*, the Sixth Circuit affirmed the dismissal of a BSA whistleblower claim where the plaintiff argued that he had provided information regarding a possible violation by directing a third party to email the Federal Reserve, where the email itself merely inquired whether a Suspicious Activity Report ("SAR") ought to be filed.  *See id.* at 962–63.  The Sixth Circuit held that such an email was "quite far from the kind of 'information' contemplated by the federal statutes," as it "provided no meaningful details on the violator or the violation."  *Id.*

In response, Taft argues that the memo's requests for "guidance" should be understood as a euphemism "to soften the memo's recognition that ABC had possibly violated the law."[14]  Taft

---

[14] In her brief, Taft also makes a number of arguments that are foreclosed from consideration on this motion.  She represents that she was made to water down the memo, to camouflage its references to violations of law, *see* Taft Br. 12; that allegation, absent from the Amended

Br. 13; *see also* Tr. 24.  And, she notes, *see* Taft Br. 11, the facts in *Hill* are distinguishable:

While the email in *Hill* merely *asked* whether a SAR ought to be filed, the memo that Taft sent

expressly invoked concerns about regulatory compliance.  *See* Memo at 4 (noting "risk for

adequate [Office of Foreign Assets Control] screening or [anti-money laundering] monitoring

controls"); *id.* at 5 (noting that "regulators are taking a very firm approach to ensure clearing

banks have adequate policies and controls").  And, unlike in *Hill*, it cannot be said that the memo

provided "no meaningful details on the violator or the violation."  *Hill*, 309 F. App'x at 963.

The Court certainly agrees that the mere fact that a communication seeks "guidance"

does not necessarily exclude it from whistleblower protection under § 5328(a).  A

communication must be read on its own individual terms.  In context, a request for "guidance"

may also convey information regarding a potential illegality (or be a well-understood euphemism

for doing so).  Indeed, courts interpreting the similarly worded FCUA whistleblower provision

have held that reports that fell short of making straightforward accusations of illegality may

nonetheless be protected.  In *Garrett v. Langley Federal Credit Union*, for instance, the court

held that a report of a "rumor" that the credit union's president had paid off another employee's

credit card debt provided sufficient information regarding a possible violation of a regulation

requiring that all transactions with "business associates" be conducted in the credit union's best

---

Complaint, is not cognizable.  Taft also suggests that the FRBNY's written response to her
memo will, if it comes to light in discovery, demonstrate "the real context" behind the memo.
*Id.* at 14.  But the FRBNY's response, too, is not cognizable on this motion, as the Amended
Complaint makes no allegations about its content and does not otherwise incorporate it by
reference (and it has not been furnished to the Court).  Finally, the Amended Complaint refers
generally to conversations with the FRBNY's Supervisory Manager, but it does not allege with
any specificity *what* Taft reported during those conversations, stating only, conclusorily, that she
"discussed her concerns about possible violations of law by ABC."  Am. Compl. ¶ 17.  This bare
legal conclusion is not cognizable on a motion to dismiss.  *See Iqbal*, 556 U.S. at 678.

interest.  121 F. Supp. 2d at 899–900.  Unavoidably, a court must undertake a report-specific

assessment of the particular information conveyed to the regulator to determine whether the

report was of "information … regarding a possible violation" of a law or regulation specified in

the statute.  In some cases, the four corners of the report to the regulator will suffice to answer

that question.  In others, additional allegations (perhaps elaborating on the background to the

report or the regulator's response to it) may be necessary to show that the conveyed information

"regard[ed] a possible violation" of law.  31 U.S.C. § 5328(a).

The Court's judgment here, however, is that the memo to the FRBNY, even as explicated

by the Amended Complaint, fell short of reporting information regarding a possible violation of

law.  The memo pointedly states that Taft's own Compliance Department "was not able to

identify [a] specific regulation" governing the conduct in question, that it had reached out to

other industry participants "to better understand what the regulatory expectations are," and that it

had identified "various methods" of dealing with the issue.  Memo at 4.  In addition, as ABC

argues, a "loophole" in the law—Taft's own characterization of the problem the memo

identified—by definition refers to the *absence* of an applicable law or regulation.  ABC Reply 6

n.3.  Finally, the memo prefaces its discussion by stating that it sought regulatory guidance so

"we continue to operate in the most compliant manner," suggesting that the bank regarded its

conduct as compliant and merely sought guidance to continue as such.  Memo at 3.  Thus,

reading the memo and the Amended Complaint as a whole, it strongly appears that Taft, rather

than reporting a possible violation of law, was seeking guidance on "best practices."

Still, the Court will permit Taft to replead as to this element as well.  It may be that an

Amended Complaint can clear this pleading hurdle, perhaps by quoting the language that Taft

allegedly "watered down" from the original memo,[15] by citing the FRBNY's response,[16] by elaborating on the content of Taft's conversations with the FRBNY, or by other means.  Taft is admonished that the memo itself is insufficient, within its four corners, to adequately plead this element.  Should Taft file a Second Amended Complaint, the Court expects that she will significantly amplify, and make more specific, her factual allegations as to this element.

### 3.   Did the FRBNY Memo Cause the Alleged Retaliation?

Finally, ABC argues that the Amended Complaint has inadequately pled that Taft was retaliated against "because" she provided information to the FRBNY.  31 U.S.C. § 5328(a).  ABC suggests that the statutory term "because" erects a more demanding standard of causation than is set forth by other anti-retaliation statutes.  *See* ABC Br. 16 n.7.  The WPA, for example, requires that the protected activity have been a "contributing factor," *see* 5 U.S.C. § 1221(e)(1), and other employment retaliation statutes require merely a "causal connection."  *See, e.g.*, *Hicks v. Baines*, 593 F.3d 159, 164 (2d Cir. 2010) (Title VII).  As with the other issues before the Court, there is scant guidance as to the appropriate test for assessing causation in the BSA context.

---

[15] New allegations regarding the ostensible watering-down of the memo, of course, may harm as well as hurt Taft in her effort to state a BSA claim.  They may assist Taft in her bid to show that the memo was reporting a potential violation of law, but ABC's modification of the memo may also show that the bank, as opposed to Taft, is properly viewed as the sender of the memo to the FRBNY.  *See Segarra*, 17 F. Supp. 3d at 310 (merely being "asked to alter" a report does not trigger whistleblower protection).

[16] At argument, Taft's counsel represented that he had received that morning, from the FRBNY, its response to ABC's memo.  *See* Tr. 26.  Taft's counsel also expressed concern that regulatory interests in confidentiality might limit counsel's ability to publicly quote the memo.  Tr. 25.  The proper solution to such concerns is for counsel to file a Second Amended Complaint ("SAC") under seal, and to publicly file a version of the SAC that redacts any references to confidential material, while the Court determines if there is indeed a need for such redaction.

Without a more convincing showing that Congress intended to impose a more rigorous showing of causation for retaliation claims under the BSA, the Court assumes *arguendo* that—as with, *inter alia*, employment discrimination claims under Title VII—protected conduct need not be the sole cause of the adverse employment action to qualify as actionable retaliation, and such causation may be shown indirectly, by means of circumstantial evidence. *See Balko*, 2014 WL 1377580, at * 20 (temporal proximity along with "other evidence that her termination was in retaliation for her complaints" sufficient to state prima facie case of FCUA retaliation); *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 845 (2d Cir. 2013) ("[T]he but-for causation standard [for Title VII claims] does not alter the plaintiff's ability to demonstrate causation at the prima facie stage on summary judgment or at trial indirectly through temporal proximity."); *Summa v. Hofstra Univ.*, 708 F.3d 115, 127–28 (2d Cir. 2013) ("We have regularly held that '[t]he causal connection needed for proof of a retaliation claim can be established indirectly by showing that the protected activity was closely followed in time by the adverse action.'") (quoting *Cifra v. Gen. Elec. Co.*, 252 F.3d 205, 217 (2d Cir. 2001)); *see also McNett v. Hardin Cmty. Fed. Credit Union*, 118 F. App'x 960, 964 (6th Cir. 2004) (applying "causal connection" test in FCUA case).

Measured against those familiar standards, Taft has adequately alleged causation.[17]  ABC largely argues that too much time elapsed between Taft's memo and her constructive discharge, *i.e.*, the seven months between November 2014 and June 2015.  ABC Reply 10.  But the relevant time period is instead between the memo and the first adverse employment actions in the series taken against her, which, as alleged, began shortly after the FRBNY's response to the memo, in February 2015, just three months after the memo was sent.  *See* Am. Compl. ¶¶ 22–23.  Three

---

[17] However, should there be a new round of briefing on a BSA claim, the Court would benefit from more attention to the appropriate standard of causation to be applied in the BSA context.

months is not so long a passage of time to be disqualifying as a temporal link.  *See Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 110 (2d Cir. 2010) (for Title VII claim, five months is not always "too long to find the causal relationship").  And here, the Amended Complaint plausibly explains why the retaliation occurred when it did:  It was allegedly triggered by the FRBNY's unwelcome response to Taft's memo.  *See* Am. Compl. ¶¶ 22–23.  These allegations suffice to adequately plead causation.

ABC also argues that Taft was actually promoted in March 2015 and given a discretionary bonus, *see* ABC Br. 16, but these factual allegations by the defendant are, of course, not cognizable on a motion to dismiss.  ABC argues further that "the essence of Taft's case is that she was treated poorly because she is a woman, not because she is a whistleblower." *Id.* at 17.  But the law does not prohibit Taft from alleging multiple unlawful reasons for her termination—*i.e.*, that it was both an act of gender discrimination and an act of retaliation for whistleblowing.  *See* Am. Compl. ¶ 21 (alleging that ABC's negative reaction to the FRBNY's response "was exacerbated by ABC's discriminatory belief that Taft, as a woman, should not have been in a position to create such issues for the Bank").

## IV.    Leave to Replead

For the reasons noted, leave to replead is appropriate in this case.  While, as ABC notes, Taft has already had an opportunity to amend as a matter of course, the Court is not prepared to say that an amendment would necessarily be futile, and the Court's significant elaboration here on the requirements of the BSA counsels in favor of giving Taft an opportunity to replead.  In light of the "liberal spirit" of the Federal Rules, *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 191 (2d Cir. 2015) (quoting *Williams v. Citigroup Inc.*, 659 F.3d 208, 214 (2d Cir. 2011)), the Court grants Taft leave to replead.

## CONCLUSION

For the foregoing reasons, the Court grants ABC's motion to dismiss with leave to
replead.  Taft must file any Second Amended Complaint by January 27, 2016.  ABC will then
have two weeks to answer or move to dismiss.  If it moves to dismiss, Taft will have two weeks
to oppose that motion, and ABC will then have one week to reply.


SO ORDERED.

Paul A. Engelmayer
United States District Judge


Dated: January 6, 2016
      New York, New York