# EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X

NATASHA TAFT,                                                    **15 CV 05321 (PAE)**

                  *Plaintiff,*                         **PLAINTIFF'S SECOND**
                                                      **AMENDED COMPLAINT**

     -against-

                                                        **PLAINTIFF HEREBY**

 AGRICULTURAL BANK OF CHINA LIMITED,          **DEMANDS A TRIAL**
                                                       **BY JURY**

                    *Defendant.*

-----------------------------------------------------------------------X

      Plaintiff, Natasha Taft, as and for her Second Amended Complaint, all upon information and belief, respectfully alleges as follows:


## JURISDICTION AND VENUE

      1.      This Court has original jurisdiction over the subject matter of this litigation pursuant to 28 U.S.C §1331, in that certain of the Plaintiff's claims arise under the laws of the United States, namely under the Bank Secrecy Act, 31 U.S.C. §5328(a).


      2.      Venue is proper under 42 U.S.C §2000e-5(f)(3) and 28 U.S.C §1391(b) because the events or omissions giving rise to the claims occurred in the Southern District of New York and the Defendant resides in this District.


## IDENTITY OF PARTIES

      3.      At all relevant times, Plaintiff, Natasha Taft ("Taft"), was employed by Defendant, Agricultural Bank of China ("ABC"), from August 2014 until June 5, 2015, when she was constructively discharged.

4.     ABC is one of the "Big Four" banks in the People's Republic of China, with headquarters in Dongcheng District, Beijing and branches throughout mainland China and around the world, including New York.

5.     At all relevant times mentioned herein, ABC operated a licensed branch in the County, City and State of New York, from which Taft performed her duties for ABC.

## BACKGROUND RELEVANT TO ALL CAUSES OF ACTION

6.     Taft commenced her employment with ABC in August 2014 as Chief Compliance Officer ("CCO") and the Head of Legal and Compliance.

7.     ABC had recently opened the New York branch, ABC's only branch in the United States, opened on August 16, 2012.

8.     At the time her employment began, Ming Yu ("Yu") was the General Manager of the New York Branch, and Jason Zhang ("Zhang") was the Deputy General Manager and the individual to whom Taft reported.

9.     At that time, Taft was a seasoned and distinguished Compliance Officer with 18 years of experience in the field of compliance and anti-money laundering.

10.     As Chief Compliance Officer, Taft was the only "C" level female and the only non-Chinese female manager.

11.     From the outset of her employment with ABC, Taft observed the subservient manner in which ABC's management treated its female employees, which included, for example, having female office staff serve green tea to the male executives and having attractive female employees, including an attorney, positioned in chairs along the windows of the conference room as decoration during management meetings.

12.      Despite her diligence in fulfilling her duties, Taft came to realize that Yu viewed her not as the competent CCO she actually was, but rather as a woman who he could manipulate and/or disregard because of his chauvinistic view of women.

13.     For example, Yu, the most senior individual at ABC's offices in New York, which was the Bank's only branch in the United States, routinely engaged in the following discriminatory conduct toward Taft because of her gender:

- Repeatedly demeaning Taft in the workplace in front of other senior employees by making remarks about her physical appearance, such as stating that she was "beautiful," "tall" and "blonde" and that he loved taking pictures next to her because of how she looked;

- Suggestively telling Taft that he would love to take her to Brazil, China and other places, giving Taft the impression that such a trip would not be entirely business-related;

3

- Telling Taft to repeat the Chinese phrase, "Wo I Knee," during a senior management lunch, which she did, causing all the Chinese attendees at the lunch to laugh and when Taft inquired as to what was so funny, then telling Taft that the phrase meant, "I love you," which was not something Taft felt toward or would ever say to her superior;

- Introducing Taft as a CCO, who is "needed for passing exams," and who is also very "pretty and blonde" to 12 members of ABC's Home Office in China who were visiting the New York Branch;

- Telling the Global Chief Compliance Officer (Taft's ultimate boss who she had not yet met), located in China, at the end of a group meeting, to hold a separate meeting with Taft and then telling him, "I hope you enjoy this meeting. Natasha is very pretty and pleasant to look at;"

- Telling Taft, "You remind me of a Russian spy. You're so pretty and blonde;"

- Dismissing Taft's valid compliance and regulatory concerns and changing the subject to Taft's looks and appearance; and

- In addition to Yu's conduct, Joe Franzese ("Franzese"), the Chief Financial Officer, also demonstrated ABC's discriminatory view of women, as confirmed by his telling Taft, when she asked what certain men were laughing about in Chinese, "They're probably talking about your boobs."

The acts mentioned above are not all-inclusive, but instead are only examples of the humiliating conduct to which Taft was subjected, all of which created a hostile work environment where Taft was treated less well because of her gender.

4

14.     From the start of her employment, Taft worked diligently and effectively to address and resolve serious issues identified during the New York State and Federal Bank Secrecy Act/Anti-Money Laundering Examination, which examination ended at or around the same time Taft commenced her employment with ABC.

15.     Taft, as the Compliance Officer, was responsible for ensuring that ABC complied with the many regulations governing its transactions, including the Bank Secrecy Act and its corresponding federal regulations, which require entities like ABC "to guard against money laundering through financial institutions" and to "establish anti-money laundering programs," which include "the designation of a compliance officer."  31 U.S.C. §5318(h).

16.     In fact, Taft was personally responsible for ensuring that ABC complied with these regulations and was personally subject to various penalties if she failed in her obligations, including fines of up to $25,000 per day for each violation (31 U.S.C. §5321(a)), an injunction being issued against her (31 U.S.C. §5320) and criminal penalties (31 U.S.C. §5322).

17.     Taft's Compliance Department had a large number of international transactions to monitor, since ABC used the New York branch to convert foreign funds to United States dollars and then distribute those funds to customers worldwide.

18.     ABC used the messaging network operated by the Society for Worldwide Interbank Financial Telecommunication ("SWIFT") to transmit information and instructions related to the

5

transfer of money around the globe, which transactions Taft and her Compliance Department were tasked with monitoring to ensure that the Bank adhered to anti-terrorism and anti-money laundering regulations.

19.     Instructions relating to bank-to-bank transactions were prepared using the SWIFT MT202 format and instructions on transactions on behalf of a customer were prepared using the SWIFT MT202 COV format.

20.     In or around September 2014, members of Taft's Compliance Department came to her and advised her that they believed that ABC was improperly using the MT202 format for overseas transactions involving customers, raising concerns because the customer was not being identified.

21.     Taft investigated the concerns of her team, which revealed that a staggering 30% of ABC's transactions, approximately, contained a code of letters and numbers in field 21 of the MT202 format.

22.     Taft knew that field 21 on the MT202 format was not required to be filled in and was generally left blank in a bank-to-bank transaction.

23.     To Taft, the reference code that ABC included in field 21 clearly represented a customer, indicating to Taft that the transaction at issue was not actually a bank-to-bank transfer, but

6

rather was a payment made on behalf of a customer, so that a MT202 COV format should have be used, containing information regarding the transmittor and recipient.

24.     Due to the volume of transactions prepared in this manner, Taft became concerned that the bank was improperly labeling transactions made on behalf of customers as bank-to-bank transactions to hide information regarding the transmittor and recipient.

25.     Taft was particularly concerned about ABC's failure to properly identify the parties involved in its transactions because, shortly after her employment commenced, Taft had seen transactions come through ABC's New York branch where customers names were missing, and when Taft had requested that ABC's home office in China identify the customer's information, which request had to be approved by either Yu or Zhang, Taft learned that the transactions involved sanctioned countries, such as Iran and Sudan, which was a violation of the rules of the Office of Foreign Assets Control ("OFAC") and ████████████████████████████████ ████████████████████████

26.     Taft reasonably believed that, given her observations, ABC was possibly violating the Bank Secrecy Act, including the regulation codified at 31 C.F.R. §103.33(g), known as the Bank Secrecy Act's "Travel rule," which requires financial institutions, including ABC, to "include in any transmittal order for a transmittal of funds in the amount of $3,000 or more," information regarding the name and address of the transmittor, as well as the name and address of the recipient.

27.     Without the name and address of the transmittor and recipient, Taft's Compliance Department was unable to properly screen and monitor approximately 30% of the branch's transactions to ensure that ABC was complying with OFAC and other and anti-money laundering ("AML") controls, including preparing reports of suspicious activity.

28.     Taft brought her concerns to the attention of Zhang, the Deputy General Manager, and Franzese, the Chief Financial Officer, yet ABC dismissed her, telling her that she was wrong and that there were no issues with the transactions Taft identified, which was incorrect and was motivated by ABC's desire to continue its potentially unlawful actions and its discriminatory refusal to take Taft seriously because of her gender.

29.     ABC's discriminatory and humiliating dismissal of her valid concerns, in complete disregard of her years of experience as a Compliance Officer, was devastating to Taft and caused her to fear for her employment.

30.     In addition to dismissing Taft's concerns as "wrong," ABC no longer permitted Taft to investigate the names of the customers associated with the codes listed in field 21, as Yu and Zhang refused to authorize Taft's Compliance Department's requests for information ("RFI") to the home office in China.

31.     Taft's Compliance Department, therefore, was unable to run the name of the parties at issue in the transactions through the filters that were required by OFAC to determine if a

suspicious transaction was occurring, which made Taft even more concerned that ABC was hiding unlawful conduct.

32.     Further concerning Taft was the fact that she remained personally responsible for ABC's actions and was aware of actions taken against other Compliance Officers for failing to ensure adequate Bank Secrecy Act, OFAC and AML controls, and ABC's potentially illegal transactions were continuing, so that Taft felt no choice but to communicate her concerns over ABC's possible violations of law to the regulators, in risk of her own personal job security.

33.     Ultimately, in a meeting with Yu, Taft advised ABC that she had an obligation to report her findings to the regulators and that she would do so, regardless of whether ABC would consent or not.

34.     Taft agreed that she would couch her concerns as a "request for guidance," even though ABC and Taft knew very well that Taft was not actually seeking guidance, but rather was addressing what she believed was a potential violation of law.

35.     Soon thereafter, Taft telephoned and spoke with William Hilton ("Hilton"), the Supervisory Manager of Foreign Financial Institutions of the Federal Reserve Bank of New York ("FRBNY"), during which call Taft ███████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████

36.     Taft also advised Hilton that ████████████████████████

████████████████████████████████████████████

████████

37.     Hilton, during the call, ████████████████████████

████████████████████████████████████████████

██████████████

38.     After ABC learned that Taft had spoken to the FRBNY, ABC enacted a rule that no one was permitted to speak to the regulators without Zhang or Franzese present, demonstrating that ABC was attempting to interfere with and prevent Taft from further communicating with the FRBNY regarding possible violations of law.

39.     Taft, thereafter, prepared a memo that ABC edited and modified, regardless of the fact that Taft was supposed to be independent as the Compliance Officer.

40.    Instead of permitting Taft to remain independent, as is common and expected for Compliance officers, ABC required Taft to report directly to Zhang, the Deputy General Manager, who demanded significant input into the wording of Taft's memo and sought to dilute the seriousness of the conduct referenced in the memo.

41.    Ultimately, Taft submitted a memo to Hilton on November 12, 2014 (attached as Exhibit A), which, while couched as a request for "guidance," ████████████████████████

██████████████████████████████████████████████████████████████████

████████████████

42.    Irrespective of the watered-down memo, Taft had already independently communicated her belief that ██████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████

43.    The FRBNY responded by letter dated February 4, 2015 (attached as Exhibit B), which ████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

████████████████████████████████████████

11

44.     The memo continued that ███████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████

45.     As a result of Taft's communications with the regulators about a possible violation

of law – which ABC never wanted Taft to have and which only occurred because of Taft's

independent efforts – ████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████, which ABC was required to addressed before the next examination by the

regulators, which caused serious concerns for ABC.

46.     ABC's management, who had repeatedly opposed Taft's efforts to even speak with

the regulators, became furious at Taft for impacting their business and exposing the Bank to potential

compliance and regulatory consequences, and sought to punish her for doing so, all of which was

exacerbated by ABC's discriminatory belief that Taft, as a woman, should not have been in a

position to create such issues for the Bank.

47.     ABC, thereafter, took adverse action against Taft that was frightening and

intimidating to her, and which included, but was not limited to:

- Prohibiting Taft from communicating with the regulators or the attorneys that ABC retained in response to the letter from the federal regulators dated February 4, 2015, even though she was CCO and head of legal and compliance;

- Transferring certain of Taft's compliance responsibilities to its male Chief Financial Officer, who had no compliance experience;

- Prohibiting Taft from direct communication with the General Manager or from documenting her compliance concerns in writing;

- Disparaging Taft by attempting to create the appearance that the response from the regulators was due to Taft's incompetence as a Compliance officer, which was outrageously false and humiliating to Taft;

- Removing Taft's independence by requiring her to report to the Chief Financial Officer, which effectively stripped her of her ability to do her job;

- Demeaning Taft at a management meeting of department heads by accusing her of inappropriate communication because she challenged ABC's removing her independence as a Compliance officer;

- Refusing to approve certain of Taft's decisions with respect to several critical compliance matters;  and

- Pressuring Taft to terminate her lead investigator, who worked with her on investigating the issues that Taft reported to the Fed, and an information technology consultant.

The acts mentioned above are not all-inclusive, but instead are only examples of the whistleblower discrimination Taft suffered as a result of her efforts to address compliance and regulatory issues existing at ABC.

48.     ABC's hostility toward Taft after the regulators were in contact with ABC in February 2015 was extremely threatening and intimidating to Taft, and caused her to suffer severe emotional and physical distress, requiring Taft to seek medical attention.

49.     On April 1, 2015, ABC, in a further effort to punish and discriminate against Taft, abruptly and unjustifiably terminated Ricardo Mendoza, Taft's most senior Compliance Officer, with whom she had worked previously and who she had recruited to ABC, despite a strong performance evaluation that Taft provided on March 27, 2015.

50.     By that point, Taft's emotional and physical condition had deteriorated so severely that she was required to apply for short term disability leave on or about April 6, 2015.

51.     On April 14, 2015, Taft filed a formal complaint of gender and whistleblower discrimination with Angela Lam ("Lam") of ABC's Human Resource Department, which was a protected activity of which ABC was aware.

52.     Taft received no response to her complaint from Lam.

53.     Taft also retained counsel who contacted ABC on or about April 15, 2015, which was another protected activity of which ABC was aware.

54.     Following Taft's retention of counsel, ABC commenced an investigation into Taft's complaint and was ultimately advised that, based upon the findings of the investigator, ABC rejected Taft's allegations of gender discrimination and whistleblower discrimination, which meant that ABC would take no action in response to her concerns.

55.     Accordingly, Taft, once she was able to return to work, could expect to suffer the same hostile workplace that had caused her to require disability leave in the first place.

56.     Taft's disability leave was set to expire on June 5, 2015 and Taft was faced with the decision of whether or not she could return to the same workplace where she had been subjected to discrimination and whistleblower retaliation.

57.     Taft reasonably could not return to a place that brought back such terrible and painful experiences for her and, as a result, Taft was constructively discharged on June 5, 2015.

58.     As a result of ABC's unlawful conduct, Taft has suffered the adverse effects of discrimination and the quality of her life, self-esteem and self-respect have been adversely impacted because she was subjected to the intimidating and humiliating types of conduct described herein, for which Taft has been required to seek medical attention, all of which will continue into the future and remain a source of humiliation, anguish, and financial loss to Taft.

59.     Here, the acts of ABC were done with reckless indifference in the face of a perceived risk that its actions would violate Taft's protected rights under the New York City Human Rights Law, that, in addition to all the damages inflicted upon Taft and in addition to all the measures of relief to which Taft may properly be entitled herein, ABC should also be required to pay punitive damages as punishment for its discriminatory conduct, in order to deter ABC and others similarly situated from engaging in such conduct in the future.

**AS AND FOR A FIRST CAUSE OF ACTION ON BEHALF OF TAFT AGAINST ABC FOR GENDER DISCRIMINATION IN VIOLATION OF CHAPTER I, TITLE 8, § 8-107(1)(a) OF THE ADMINISTRATIVE CODE OF THE CITY OF NEW YORK**

60.     Taft repeats, re-alleges and incorporates in full paragraphs 1 through 59 of this Complaint, as though fully set forth at length herein.

61.     The entirety of the acts which constitute and form this cause of action, as set forth above, all of which are deemed repeated and re-alleged herein, as though said paragraphs were specifically set forth herein, were perpetrated upon Taft while she was in the course of her employment with ABC.

62.     ABC treated Taft less well because of her gender and took adverse employment action against her, which culminated in her constructive discharge, all of which was permitted and condoned by ABC.

16

63.     Taft was caused to suffer financial loss and emotional injuries because of ABC discriminatory conduct in violation of Taft's human rights, and which impacted her emotional and physical health, career, well-being and the quality of her life.

64.     As a result of ABC's violation of the New York City Human Rights Law, Taft has required medical treatment in order to cope with the emotional and physical injuries inflicted upon her by ABC and continues to require and receive medical treatment for her injuries.

65.     The aforementioned acts of ABC constitute unlawful gender discrimination against Taft in violation of Chapter I, Title 8 of the Administrative Code of the City of New York, §8-107(1)(a) (referred to as The New York City Human Rights Law), which provides *inter alia*, that:

> It shall be unlawful discriminatory practice: (a) For an employer or an employee or agent thereof, because of the . . . gender . . . of any person to discriminate against such a person in compensation or in terms, conditions or privileges of employment.

66.     As a result of ABC's violation of the New York City Human Rights Law §8-107(1)(a), ABC is liable to Taft pursuant to §8-502(a) of said statute for "damages, including punitive damages," and pursuant to §8-502(f) of said statute for "costs and reasonable attorney's fees," as provided for under the law.

67.     As a proximate result of ABC's conduct, Taft has been adversely affected in her employment, career, well-being, the quality of her life and in her normal life's pursuits, and Taft believes ABC's conduct, complained of herein, has and will continue to have an irreparable effect

17

upon her career and the quality of her life, all of which Taft alleges to be in the amount of Three Million ($3,000,000) Dollars.

68.      Here, the acts of ABC were so reprehensible and were done with reckless indifference in the face of a perceived risk that its actions would violate Taft's protected rights under the New York City Human Rights Law, that, in addition to all the damages inflicted upon Taft and in addition to all the measures of relief to which Taft may properly be entitled herein, ABC should additionally be required to pay punitive damages as punishment for its discriminatory conduct in the further amount of Five Million ($5,000,000) Dollars, in order to deter ABC and others similarly situated from engaging in such conduct in the future.

69.      Taft, therefore, seeks compensatory damages in the First Cause of Action, including, among other things, the emotional and physical harm inflicted upon her in the sum of Three Million ($3,000,000) Dollars, and an additional and further sum of Five Million ($5,000,000) Dollars for punitive damages, making a total of Eight Million ($8,000,000) Dollars in this First Cause of Action, plus the costs of this action as well as reasonable attorney's fees on this First Cause of Action based on the method as has been judicially established and accepted when attorney's fees are provided under the law, as well as pre-judgment interest to the full extent permitted under the law.

**AS AND FOR A SECOND CAUSE OF ACTION ON BEHALF OF TAFT AGAINST ABC FOR WHISTLEBLOWER DISCRIMINATION UNDER THE BANK SECRECY ACT, 31 U.S.C. §5328**

70.     Taft repeats, re-alleges and incorporates in full paragraphs 1 through 59 of this Complaint, as though fully set forth at length herein.

71.     At all relevant times mentioned herein, as a branch of a foreign bank, ABC was a "financial institution" under The Bank Secrecy Act, pursuant to 31 U.S.C. §5312(a)(2).

72.     Taft providing information to the regulators regarding possible violations of various laws and regulations by ABC, including possible violations of The Bank Secrecy Act, 31 U.S.C. § 5311, *et seq.*, was a protected activity of which ABC was aware.

73.     ABC blamed Taft for opening them up to exposure through her communications with the Fed, which it never wanted her to do and repeatedly opposed Taft's efforts to communicate openly with the Fed, which she did regardless of ABC's clear animus and in risk of her own personal job security, and ABC took adverse action against her, as a result.

74.     The aforementioned acts of ABC constitute unlawful whistleblower discrimination against Taft in violation of The Bank Secrecy Act, 31 U.S.C. §5328(a), which provides, *inter alia*, that:

> No financial institution or nonfinancial trade or business may discharge or otherwise discriminate against any employee with

> respect to compensation, terms, conditions, or privileges of
> employment because the employee . . . provided information to the
> Secretary of the Treasury, the Attorney General, or any Federal
> supervisory agency regarding a possible violation of any provision of
> this subchapter . . . by the financial institution or nonfinancial trade
> or business or any director, officer, or employee of the financial
> institution or nonfinancial trade or business.

75.     ABC took adverse action against Taft "because" she "provided information" to the federal regulators regarding a "possible" violation of the Bank Secrecy Act, which culminated in her constructive discharge, so that ABC is liable to Taft pursuant to 31 U.S.C. §5328(a).

76.     As a proximate result of ABC's conduct, Taft has been adversely affected in her employment, career, well-being, the quality of her life and in her normal life's pursuits, and Taft believes ABC's conduct, complained of herein, has and will continue to have an irreparable effect upon her career and the quality of her life.

77.     Taft, therefore, seeks all remedies that are available to her under The Bank Secrecy Act, including "compensatory damages," 31 U.S.C. §5328(c)(2), in an amount to be determined at trial.

78.     Here, the acts of ABC were so reprehensible and were done with reckless indifference in the face of a perceived risk that its actions would violate Taft's protected rights that, in addition to all the damages inflicted upon Taft and in addition to all the measures of relief to which Taft may properly be entitled herein, ABC should additionally be required to pay punitive damages as

punishment for its unlawful conduct, in order to deter ABC and others similarly situated from engaging in such conduct in the future.

## PRAYER FOR RELIEF

**WHEREFORE,** Taft demands judgment against ABC on the First Cause of Action in the sum of Three Million Dollars ($3,000,000) in compensatory damages and the further and additional sum of Five Million Dollars ($5,000,000) in punitive damages for a total of Eight Million Dollars ($8,000,000) as is permitted under The New York City Human Rights Law; and on the Second Cause of Action, compensatory and punitive damages in an amount to be determined at trial; plus pre-judgment interest, the costs of this action and reasonable attorney's fees as is permitted under the law, and for such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

**SCHWARTZ & PERRY, LLP**
*Attorneys for Plaintiff*

By:____/s/_____
    DAVIDA S. PERRY (1879)
    BRIAN HELLER (4004)
    295 Madison Avenue
    New York, New York 10017
    (212) 889-6565

21

# SAC Ex. A









# SAC Ex. B

Confidential Federal Reserve Material Subject to Protective Order 000008



Confidential Federal Reserve Material Subject to Protective Order 000009

