UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------X

NATASHA TAFT,

                              Plaintiff,

              -v-

AGRICULTURAL BANK OF CHINA LTD.,

                              Defendant.

------------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 5/12/16

15 Civ. 5321 (PAE)

OPINION & ORDER

PAUL A. ENGELMAYER, District Judge:

Plaintiff Natasha Taft claims that she was constructively discharged from her position as chief compliance officer in the New York branch of defendant Agricultural Bank of China Ltd. ("ABC") in retaliation for bringing certain regulatory issues to the attention of the Federal Reserve Bank of New York ("FRBNY").[1] On January 6, 2016, the Court dismissed, with leave to amend, Taft's whistleblower claim under the Bank Secrecy Act ("BSA"), 31 U.S.C. § 5328(a). Dkt. 50, *reported at Taft v. Agric. Bank of China Ltd.*, No. 15 Civ. 5321 (PAE), 2016 WL 80209 (S.D.N.Y. Jan. 6, 2016) ("January 6 Decision"). Taft then timely amended her operative complaint, adding substantial new allegations about what she reported to the FRBNY and how it responded.

For the following reasons, the Court denies ABC's renewed motion to dismiss.

---

[1] Taft also claims that she was discriminated against because of her gender. ABC has not moved to dismiss that claim; discovery is underway.

# I.    Background[2]

## A.    Facts

Taft was employed by ABC between August 2014 and June 5, 2015, when, she alleges, she was constructively discharged. SAC ¶ 3. During this time, she was the chief compliance officer and head of legal and compliance at ABC's New York branch. *Id.* ¶ 6. Taft had 18 years of experience in compliance and anti-money laundering. *Id.* ¶ 9. As chief compliance officer, she reported to Jason Zhang, the branch's deputy general manager; Ming Yu was the general manager. *Id.* ¶ 8. During this time, Taft was the only "C" level female (referring to corporate management) and the only non-Chinese female manager. *Id.* ¶ 10.

In her capacity as chief compliance officer, Taft "was responsible for ensuring that ABC complied with the many regulations governing its transactions, including the [BSA] and its corresponding federal regulations." *Id.* ¶ 15. Among other things, Taft and her Compliance Department "were tasked with monitoring" the branch's "large number of international transactions" to "ensure that [ABC] adhered to anti-terrorism and anti-money laundering regulations." *Id.* ¶¶ 17–18. (The BSA principally requires financial institutions to keep records and file reports that might assist government agencies in detecting and preventing money laundering. *See Bank Secrecy Act*, United States Dep't of the Treasury, https://perma.cc/YC7F-3LEB.)

ABC used the network operated by the Society for Worldwide Interbank Financial Telecommunication ("SWIFT") to transmit information related to international financial transactions. *Id.* ¶ 18. ABC used the SWIFT "MT202" format to prepare instructions relating to

---

[2] For the purpose of resolving the motion to dismiss, the Court assumes all well-pled facts in the Second Amended Complaint, Dkt. 57 ("SAC"), to be true, drawing all reasonable inferences in Taft's favor. *See Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012).

bank-to-bank transactions, while transactions on behalf of customers were prepared using the "MT202 COV" format. *Id.* ¶ 19.

In or around September 2014, Taft, following a tip from members of her department, discovered that "a staggering 30% of ABC's transactions, approximately, contained a code of letters and numbers in field 21 of the MT202 format," which Taft knew was "not required to be filled in and was generally left blank in a bank-to-bank transaction." *Id.* ¶¶ 21–22. To Taft, this indicated that the transaction was "not actually a bank-to-bank transfer, but rather was a payment made on behalf of a customer, so that a MT202 COV format should have been used, containing information regarding the transmittor and recipient." *Id.* ¶ 23. On this basis, Taft became concerned that ABC was "improperly labeling transactions" so as "to hide information regarding the transmittor and recipient." *Id.* ¶ 24.

Taft believed that this practice possibly violated the BSA's "Travel Rule." *Id.* ¶ 26. The Travel Rule, a regulation promulgated under the BSA, requires a transmittor's financial institution to include specified customer-identifying information[3] in any transmittal order of $3,000 or more; it also requires an intermediary financial institution[4] to convey the same information in any corresponding transmittal order *if received* from the transmittor's financial institution. *See* 31 C.F.R. § 1010.410(f). Without such customer-identifying information, Taft alleges, her Compliance Department "was unable to properly screen and monitor approximately

---

[3] The required information generally includes, *inter alia*, the name, account number, and address of the transmittor, and the same identifying information for the recipient if such information is received with the transmittal order.

[4] An intermediary financial institution is a financial institution that receives instructions pertaining to a financial transaction but is not the recipient's, *i.e.*, beneficiary's, financial institution. *See* 31 C.F.R. § 1010.100.

30% of the branch's transactions to ensure" compliance with Office of Foreign Assets Control

("OFAC") and other anti-money laundering ("AML") requirements. *Id.* ¶ 27.

Taft brought these concerns to her boss Zhang and to chief financial officer Joe Franzese,

but she was told "she was wrong and that there were no issues with the transactions [she]

identified." *Id.* ¶ 28. Thereafter, Yu and Zhang, contrary to past practice, refused to allow Taft's

Compliance Department to request information from ABC's home office about the customers

associated with the identified transactions. *Id.* ¶ 30. Therefore, the Compliance Department

could not run the transactions through OFAC filters to determine if they involved prohibited

countries, such as Iran or Sudan. *Id.* ¶ 31; *see also id.* ¶ 25 (describing other transactions that

Taft learned, after an information request to the home office, involved such sanctioned

countries).

Taft ultimately advised Yu that "she had an obligation to report her findings to the

regulators and that she would do so, regardless of whether ABC would consent or not." *Id.* ¶ 33.

Taft agreed to "couch her concerns as a 'request for guidance,'" even though ABC and Taft

knew that she was addressing "what she believed was a potential violation of law." *Id.* ¶ 34.

Shortly thereafter, Taft called William Hilton, the FRBNY's Supervisory Manager of

Foreign Financial Institutions. On that call, Taft "described ABC's conduct and her concern that

[ABC] was intentionally violating the law," pointing to "weak customer due diligence for trade

finance customers, lack of information on those payments, heavy volumes of those payments,

misusing payment formats, a history of OFAC reported potential violations, transactions

involving Iran, Sudan and other high-risk areas, weak [AML] monitoring controls and a refusal

to respond to Compliance's requests for information." *Id.* ¶ 35. She also told Hilton she had

"faced hostility from management" for raising these concerns. *Id.* ¶ 36. Hilton asked Taft to send a memo reflecting her concerns. *Id.* ¶ 37.

After ABC learned about this phone call, it forbade employees from speaking with regulators unless Zhang or Franzese were present. *Id.* ¶ 38. Taft then prepared a memo, as Hilton requested. *Id.* ¶ 39. Zhang "demanded significant input into the wording of Taft's memo and sought to dilute the seriousness of the conduct referenced in the memo." *Id.* ¶ 40. But, Taft alleges, ABC "never wanted" Taft to communicate with regulators at all and the communication "only occurred because of Taft's independent efforts." *Id.* ¶ 45.

The memo from Taft to Hilton, dated November 10, 2014, begins by referring to their "recent conversation." SAC, Ex. A, at 1 ("Memo"). The Memo expresses "concerns" and seeks "guidance" about the Compliance Department's discovery of a "number of transactions related to clearing US Dollars for ABC's Trade related customers for Letters of Credit and Collection transactions," with respect to which the customers "are not identified on [the] payment messages." *Id.* at 1. The Memo states that "Compliance believes this represents risk for adequate OFAC screening or AML monitoring controls." *Id.* at 2.

The Memo reports that, before seeking the FRBNY's guidance on this issue, the Compliance Department "reached out to other banks, consulting firms and the regulators to better understand what the regulatory expectations are and what the industry practices are with respect to such transactions." *Id.* It adds that "Compliance was not able to identify specific regulation with respect to such scenarios," although it identified "various methods" in the industry for addressing the issue. *Id.* The Memo concludes by stating that "Trade Finance is a new frontier for money laundering and the regulators are taking a very firm approach to ensure clearing banks have adequate policies and controls," and, therefore, "we seek your guidance to

further address this issue." *Id.* at 3. Attached to the Memo was a document titled "Travel Rule Violation Example.pdf." *Id.* at 2. That document appears to be a print-out from the SWIFT messaging system; at the top of the document, someone, perhaps Taft, has scrawled "Trade Fin. Transaction without orig/ben." *Id.* at 4.

On February 4, 2015, the FRBNY—specifically Lawrence F. Rostoker, Supervisory Team Manager of the Financial Institution Supervision Group—responded to the Memo with a letter addressed to Zhang and Yu. *See* SAC, Ex. B ("FRBNY Letter"); *see also* SAC ¶ 43 (alleging that the letter was in response to the Memo). The FRBNY Letter said that "there is concern that MT202 payment messages are inappropriately being used for trade finance-related transactions rather than the MT202COV payment messages, which would include details of the underlying originators and beneficiaries or the customers and/or counterparties." FRBNY Letter at 1. The FRBNY Letter added that ABC was "processing significant volumes of trade finance-related transactions via MT202 messages." *Id.* This fact, "coupled with overall heightened risks posed by trade finance activities due to the lack of adequate transparency[,] raise concerns of undue BSA/AML and OFAC risks to the branch." *Id.* at 1–2. Therefore, the FRBNY wrote, "it is prudent for the branch to require transparency about all underlying customers in such transactions," *e.g.*, by instructing its home office and "other respondents" that the MT202 COV format should be used where the bank-to-bank transfer relates to customer activity. *Id.* at 2.

Taft alleges that, as a result of the FRBNY Letter, ABC "was required to alter its business practices" to ensure greater transparency before its next regulatory examination. SAC ¶ 45. And ABC's management "became furious at Taft for impacting their business and exposing [ABC] to potential compliance and regulatory consequences, and sought to punish her for doing so." *Id.* ¶ 46. ABC took various adverse actions against Taft. These included: (1) prohibiting her from

communicating with regulators and outside attorneys; (2) transferring her job responsibilities to a person with no compliance experience; (3) disparaging her and blaming her for the regulators' response; (4) requiring her to report to the chief financial officer, which allegedly harmed her independence and ability to do her job; (5) refusing to approve certain of her decisions on critical matters; and (6) pressuring her to terminate other employees. *Id.* ¶ 47. Ultimately, ABC allegedly sought to punish Taft by terminating her most senior compliance officer, even though Taft had just given the officer a strong performance evaluation. *Id.* ¶ 49.

These alleged adverse actions caused Taft "severe emotional and physical distress," *id.* ¶ 48, requiring medical attention and ultimately causing Taft to apply for short-term disability leave on or about April 6, 2015, *id.* ¶ 50. Soon thereafter, Taft filed a formal complaint of gender and whistleblower discrimination with ABC's human resource department, *id.* ¶ 51, and retained counsel, *id.* ¶ 53. ABC investigated Taft's complaint and ultimately rejected her allegations. *Id.* ¶ 54. With her disability leave set to expire on June 5, 2015, Taft decided not to "return to the same workplace where she had been subjected to [gender] discrimination and whistleblower retaliation." *Id.* ¶ 56.

### B.    Procedural History

On July 9, 2015, Taft filed an initial Complaint. Dkt. 1 ("Compl."). It brought three claims: (1) gender discrimination in violation of the New York City Human Rights Law, *see id.* ¶¶ 33–42; (2) whistleblower discrimination under the BSA, *see id.* ¶¶ 43–49; and (3) whistleblower discrimination under the Financial Institutions Reform, Recovery, and Enforcement Act ("FIRREA"), 12 U.S.C. § 1831j, *see id.* ¶¶ 50–56.

On September 18, 2015, ABC moved to dismiss the second and third claims. Dkt. 16. On October 6, 2015, Taft filed an amended complaint, Dkt. 24 ("Am. Compl."), which dropped the FIRREA claim but retained the others.

On October 30, 2015, ABC moved to dismiss the BSA whistleblower claim. Dkt 27. After briefing and argument, the Court dismissed this claim with leave to amend. *See* January 6 Decision at \*12.

On January 27, 2016, Taft filed the SAC.[5] Dkt. 57. On February 17, 2016, ABC again moved to dismiss the BSA whistleblower claim. Dkt. 61. ABC filed a brief in support of its motion, Dkt. 65 ("ABC Br."), and the declaration of Kimberly A. Haviv, Dkt. 64 ("Haviv Decl."), and attached exhibits. On March 2, 2016, Taft filed a brief in opposition, Dkt. 68 ("Taft Br."), and the declaration of Brian Heller, Dkt. 69 ("Heller Decl."), and attached exhibits. On March 9, 2016, ABC filed a reply brief, Dkt. 73 ("ABC Reply Br."), and the supplemental declaration of Kimberly A. Haviv, Dkt. 70 ("Haviv Supp. Decl."). On April 1, 2016, the Court held argument. Dkt. 81 ("Tr.").

## II. Legal Standards on a Motion to Dismiss

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim has "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A complaint is properly dismissed where, as a matter of law, "the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Twombly*, 550 U.S. at 558.

In considering a motion to dismiss, a district court must "accept[] all factual claims in the complaint as true, and draw[] all reasonable inferences in the plaintiff's favor." *Lotes Co. v. Hon Hai Precision Indus. Co.*, 753 F.3d 395, 403 (2d Cir. 2014) (quoting *Famous Horse Inc. v. 5th*

---

[5] The dates in this paragraph reflect the dates on which the Court received the materials, not when those materials were publicly posted in redacted form on ECF.

*Ave. Photo Inc.*, 624 F.3d 106, 108 (2d Cir. 2010)) (internal quotation marks omitted). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* "[R]ather, the complaint's *factual* allegations must be enough to raise a right to relief above the speculative level, *i.e.*, enough to make the claim plausible." *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010) (quoting *Twombly*, 550 U.S. at 555, 570) (internal quotation marks omitted) (emphasis in *Arista Records*).

## III. Discussion

The Court begins by reviewing the January 6 Decision, which dismissed Taft's BSA whistleblower claim with leave to amend. It then analyzes whether the SAC's new allegations have cured the deficiencies the Court identified. Finally, the Court examines two new arguments by ABC for dismissal. One is that the SAC fails to plead causation because it does not adequately allege that ABC knew the substance of Taft's conversation with Hilton. The other is that the FRBNY is not one of the regulatory institutions with respect to which reports of potential BSA violations are protected.

### A. The January 6 Decision

Taft's whistleblower protection claim arises under a provision of the BSA, codified at 31 U.S.C. § 5328(a), which provides:

> No financial institution or nonfinancial trade or business may discharge or otherwise discriminate against any employee with respect to compensation, terms, conditions, or privileges of employment because the employee (or any person acting pursuant to the request of the employee) provided information to the Secretary of the Treasury, the Attorney General, or any Federal supervisory agency regarding a possible violation of any provision of this subchapter or section 1956, 1957, or 1960 of title 18, or any regulation under any such provision, by the financial institution or nonfinancial trade or business or any director, officer, or employee of the financial institution or nonfinancial trade or business.

Thus, as the January 6 Decision summarized, the BSA protects "(1) employees of financial institutions[6] who (2) provide information regarding a possible violation of specified laws and regulations by the financial institution, its directors, officers, or employees, to (3) the Treasury Secretary, Attorney General, or 'any Federal supervisory agency,' from (4) employment-related discrimination (5) because they made such a report." January 6 Decision at *4.

Moving to dismiss, ABC argued that (1) it, not Taft, "provided information" to the FRBNY; (2) the information provided did not concern "a possible violation" of the BSA or regulations thereunder; and (3) Taft inadequately pled causation—*i.e.*, that she suffered adverse employment action *because* she provided such information.

### 1. Did Taft Act on Behalf of ABC?

As to the first argument, the Court rejected ABC's invitation to categorically exclude compliance personnel like Taft from the protection of the BSA. It held that such employees are "not precluded from stating a retaliation claim under the BSA merely because the retaliation was in response to a report that the employee's job description required her to make." January 6 Decision at *6. Of course, the Court noted, "it does not follow that *every* communication by a compliance officer about a possible violation of law by the bank or an officer or employee falls within the scope of the statute." *Id.* (emphasis added). That is because whistleblower protection does not extend to those who "merely serve as the bank's chosen conduits for making such reports on the bank's behalf." *Id.* at *7. Instead, the putative whistleblower must allege that she "acted *independently* of the bank." *Id.*

---

[6] Section 5328(a), however, does not apply "with respect to any financial institution or nonfinancial trade or business which is subject to section 33 of the Federal Deposit Insurance Act, section 213 of the Federal Credit Union Act, or section 21A(q) of the Home Owners' Loan Act." 31 U.S.C. § 5328(e).

Applying these principles, the Court noted that the Amended Complaint itself alleged that ABC "permitted" Taft to send the Memo, *id.* at *8 (quoting Am. Compl. ¶ 16), and that the Memo and the cover email to which it was attached suggested ABC's input, *e.g.*, in the use of the first-person plural ("we") rather than singular ("I") to denote the author. *Id.* To be sure, there were also allegations suggesting that ABC resisted Taft's support for sending the Memo. But § 5328(a), the Court observed, "does not cover retaliation against an employee for internal communications or dissent." *Id.*

Nevertheless, the Court granted leave to amend on this issue because (1) Taft did not have the benefit of the Court's—or, indeed, any court's—articulation of the governing standards under § 5328(a); and (2) Taft conceivably could elaborate on her allegations about these matters in a way that would adequately plead the requisite independence from ABC. *See id.*

### 2. Did Taft Provide Information Regarding a Possible Violation of the BSA or its Regulations?

Noting that § 5328(a) protects those who merely *provide information* regarding a possible violation, the Court held that an employee does not need to explicitly name the law or regulation that may have been violated. *Id.* at *9. And the mere fact that a communication is couched as a request for "guidance" does not "necessarily exclude it from whistleblower protection." *Id.* at *10. However, the Court noted, "merely expressing a grievance or noting a suboptimal practice" will not suffice. *Id.* at *9. A contextualized "assessment of the particular information conveyed to the regulator" must be undertaken. *Id.* at *10. "In some cases," the Court observed, "the four corners of the report to the regulator will suffice" to clarify whether the report provided information regarding a possible violation. *Id.* In other cases, "additional allegations (perhaps elaborating on the background to the report or the regulator's response to it) may be necessary to

show that the conveyed information 'regard[ed] a possible violation' of law." *Id.* (quoting 31 U.S.C. § 5328(a)).

Applying these principles, the Court found the Amended Complaint deficient.  The Court noted that the Memo specifically states that "Taft's own Compliance Department 'was not able to identify [a] specific regulation' governing the conduct in question."  *Id.* (quoting Memo at 2).  Thus, the Memo did not just fail to name a legal requirement that may have been violated, which is not necessarily conclusive; it more or less *disclaimed* that any such requirement existed.  Therefore, the Court held that the Memo alone was "insufficient, within its four corners, to adequately plead" that Taft provided information regarding a possible violation of law.  *Id.* at *11.

The Court, however, granted leave to amend, noting that Taft might be able to use the FRBNY Letter (to which the Amended Complaint had conclusorily alluded) to demonstrate that the information she provided concerned a possible violation of law.  *See id.*  The Court also invited Taft to elaborate on her alleged conversation with Hilton.

### 3.      Did the Memo Cause the Alleged Retaliation?

The Court assumed *arguendo* that, under § 5328(a), protected conduct "need not be the sole cause of adverse employment action to qualify as actionable retaliation, and such causation may be shown indirectly, by means of circumstantial evidence," *e.g.*, temporal proximity.  *Id.*  The Court held that the adverse actions Taft alleged were not so distant in time from the Memo as to sever any plausible causal link.  It also noted the plausibility of the alleged timing:  ABC allegedly retaliated against Taft not at the time of the putative protected conduct, but at the time that her conduct allegedly redounded to ABC's detriment—when the FRBNY responded.  *See id.* at *12.

The Court invited further briefing on the appropriate causation standard in the event Taft amended her complaint. *See id.* at *12 n.17.

## B.      New Allegations in the SAC

The Court now turns to the SAC, analyzing its new allegations in light of the legal standards and principles described in the January 6 Decision.

### 1.      Did Taft Act on Behalf of ABC?

Taft makes three new categories of allegations relevant to assessing her independence from ABC in providing information to the FRBNY.

#### a.      New allegations about ABC's resistance

First, the SAC alleges with particularity the manner in which ABC resisted, opposed, and undermined Taft's effort to investigate and report on her concerns, in contrast to the Amended Complaint, which conclusorily alleged that ABC "strongly resisted" her. Am. Compl ¶ 15. The SAC alleges that, after Taft brought her concerns to Yu and Zhang, they refused, contrary to past practice, to allow the Compliance Department to request information from ABC's home office about the customers associated with the identified transactions. SAC ¶ 30. This prevented the Compliance Department from running the transactions through OFAC filters to determine if they involved sanctioned countries. *Id.* ¶ 31; *see also* ¶ 25. Furthermore, after ABC learned about Taft's call to Hilton (but before Taft prepared the Memo), ABC forbade employees from speaking with regulators unless Zhang or Franzese were present. *Id.* ¶ 38. These actions, which the Court must assume to be true on a motion to dismiss, are fairly read to reflect a concerted effort to stop Taft from investigating or reporting her concerns, not mere grudging acquiescence to Taft's proposal to contact the FRBNY.

Second, the SAC alleges that, before Taft spoke to Hilton or drafted the Memo, she advised Yu that "she had an obligation to report her findings to the regulators and that she would do so, *regardless* of whether ABC would consent or not." *Id.* ¶ 33 (emphasis added). Thus, although Taft agreed to "couch her concerns as a 'request for guidance,'" *id.* ¶ 34, and although Zhang "demanded significant input into the wording of Taft's memo," *id.* ¶ 40, the SAC alleges that Taft gave ABC an ultimatum, limiting ABC's role to giving input as to a report that Taft was already committed to making. This allegation, accepted as true, undermines the alternative version of events—one that the Amended Complaint, by contrast, did not exclude—in which Taft was a mere conduit for ABC's views and in which Taft merely persuaded ABC that it should contact the regulator. Instead, the SAC alleges that Taft effectively dragged ABC to the FRBNY kicking and screaming.

While ABC argues that the ultimatum "adds nothing" to Taft's claim, the case it cites for that proposition is inapposite. ABC Br. 12 (citing *Hill v. Mr. Money Fin. Co. & First Citizens Banc Corp.*, 309 F. App'x 950, 962 (6th Cir. 2009)). In *Hill*, the plaintiff had threatened to file a suspicious activity report, but was fired *before* he could do so; he proceeded, therefore, on a theory of preemptive retaliation. *See id.* The Sixth Circuit's rejection of that theory—holding that the BSA is "clear that retaliation must *follow* the provision of information to a specified federal authority," *id.*—has no application here. Here, the SAC's allegation of an ultimatum bears on—and helps clarify—who is properly considered the "provider" of the information, as between the employee who contacted the FRBNY and her employer. The fact of an ultimatum supports a finding that Taft, and decidedly not the FRBNY, was the driving force behind the report to the FRBNY.

*Segarra v. Federal Reserve Bank of New York*, 17 F. Supp. 3d 304 (S.D.N.Y. 2014), also cited by ABC, is inapposite, too. ABC notes *Segarra*'s holding that, under a whistleblower provision similar to the BSA's, "protections attach when an individual discloses protected information to a third party, not when she is asked to alter that information." *Id.* at 310; *see* ABC Br. 12–13. But while ABC is correct that the BSA does not protect internal dissent, *see* January 6 Decision at *7 n.10, the alleged conversations between Taft and ABC are relevant *not* because they constitute protected conduct in themselves, but because they shed light on whether Taft's *external* reports to the FRBNY are properly attributed to her, as opposed to ABC.

### c.       New allegations regarding the Taft/Hilton phone call

Third, the phone call to Hilton, as alleged, was clearly independent of ABC. The SAC alleges that, before the phone call, Taft agreed to frame her concerns as a "request for guidance." *Id.* ¶ 34. It then alleges that, on the subsequent call, Taft "described . . . her concern that [ABC] was intentionally violating the law." *Id.* ¶ 35. This suggests that Taft *reneged* on her pledge to ABC to frame the issue more innocuously. Further, ABC's alleged reaction to the phone call— forbidding its employees from speaking with regulators without Zhang or Franzese present, *id.* ¶ 38—suggests that it was quite displeased with the phone call. As such, it is in tension with ABC's notion that the phone call merely "carr[ied] out [an] authorized communication." ABC Br. 14.[7]

*** 

---

[7] ABC also notes that the FRBNY Letter was addressed to Yu and Zhang, not Taft, and that it refers to information "provided by the branch." FRBNY Letter at 1. Competing inferences can be drawn from these facts, but they do not solidly resolve whether it was ABC or Taft that controlled the information conveyed in the Memo and on the call. On ABC's motion to dismiss, the inferences on this point must be drawn in Taft's favor.

On the basis of the three sets of new allegations in the SAC, the Court holds that Taft has now adequately pled the requisite independence to make the reports to the FRBNY *hers*, rather than ABC's.

### 2. Did Taft Provide Information Regarding a Possible Violation of the BSA or its Regulations?

The Court first summarizes the SAC's new allegations on this point, and then analyzes whether they satisfactorily plead that Taft provided information regarding a possible violation of the Travel Rule, a regulation under the BSA.

#### a. New Allegations in the SAC

The SAC amplifies the allegations in the Amended Complaint in three respects.

First, whereas the Amended Complaint did not attach the Memo and quoted just a single sentence from it,[8] *see* Am. Compl. ¶ 16, the SAC now attaches the Memo and, importantly, provides background necessary to understand the information it conveyed. The SAC describes the alleged differences between the MT202 and the MT202 COV formats, explaining why Taft believed the latter should have been used to identify the customers involved in a large number of international transactions. *See* SAC ¶¶ 18–27. The SAC also explains how the fact that customers were not identified interfered with the Compliance Department's responsibility to monitor transactions for compliance with OFAC and AML controls. *Id.* ¶ 27.

Second, the SAC elaborates on the allegation, made cursorily in the Amended Complaint, that Taft expressed her concerns to Hilton over the phone. *See* Am. Compl. ¶ 17. Specifically, the SAC alleges that, speaking with Hilton before she sent the Memo, Taft "described ABC's conduct and her concern that [ABC] was intentionally violating the law" based on her

---

[8] The Memo was nevertheless cognizable because the Court deemed it to be incorporated by and integral to the Amended Complaint. January 6th Decision at *1 n.3.

observations of ABC's "weak customer due diligence for trade finance customers, lack of information on those payments, heavy volumes of those payments, misusing payment formats, a history of OFAC reported potential violations, transactions involving Iran, Sudan and other high-risk areas, weak [AML] monitoring controls and a refusal to respond to Compliance's requests for information."  SAC ¶ 35.  The SAC thus adds the allegation that the phone conversation covered topics beyond those addressed in the Memo—as ABC itself recognizes.  *See* ABC Br. 16.

ABC argues that, because the SAC alleges that the Memo "reflected the concerns that Taft had already raised with Hilton," SAC ¶ 41, and because the Memo itself refers to the phone conversation, *see* Memo at 1, Taft literally *could not* have "raised this variety of other matters with Hilton by phone."  ABC Br. 16.  But ABC's claim that the Memo contradicts the SAC's new allegations does not follow.  The Memo could broadly synopsize the concerns that Taft had telephonically raised without fully reporting them.  Further, that ABC had a hand in editing the Memo, whereas Taft alone was party to the call with Hilton, helpfully explains why the Memo might not have fully replicated the call.  Rather, the phone call, as recounted in the SAC, is fairly viewed as a supplement to the more anodyne Memo.  To determine whether the SAC states a claim, the Court therefore must assess the cumulative impact of what Taft, in the two fora together, allegedly conveyed to the FRBNY.

Third, and most important, the SAC attaches the FRBNY Letter responding to Taft's reports.  The Amended Complaint had alleged nothing about the FRBNY's response, save that it "caused serious concerns for ABC."  Am. Compl. ¶ 19.  The FRBNY's response, however, helps

clarify what Taft reported.[9] *See Balko v. Ukrainian Nat. Fed. Credit Union*, No. 13 Civ. 1333

(LAK) (AJP), 2014 WL 1377580, at *19 (S.D.N.Y. Mar. 28, 2014) (noting that "events that

followed [plaintiff's] disclosures" showed that her disclosures concerned possible violations of

law) (cited in January 6 Decision at *9).[10]

The FRBNY Letter reported "concern that MT202 payment messages are inappropriately

being used for trade finance-related transactions rather than the MT202COV payment messages,

which would include details of the underlying originators and beneficiaries or the customers

and/or counterparties." FRBNY Letter at 1. According to the FRBNY, the high volume of such

transactions, "coupled with overall heightened risks posed by trade finance activities due to the

lack of adequate transparency[,] raise concerns of undue BSA/AML and OFAC risks to the

branch." *Id.* at 1–2. Therefore, the FRBNY concluded, "it is prudent for the branch to require

transparency about all underlying customers in such transactions," *e.g.*, by instructing its home

office and "other respondents" that the MT202 COV format should be used where bank-to-bank

transfers relate to customer activity. *Id.* at 2.

> b.    *Do the new allegations satisfactorily plead that Taft provided*
>       *information regarding a possible violation of the Travel Rule?*

To determine whether the SAC's allegations implicate a possible violation of the BSA

requires closely examining the one legal provision to which Taft has pointed—the Travel Rule, a

regulation promulgated under the BSA.[11]

---

[9] ABC acknowledges that the FRBNY Letter was "addressing the subject matter of the memo," Tr. 9, and does not argue that it addressed matters extraneous to those raised by Taft.

[10] Judge Peck's Report and Recommendation was adopted by Judge Kaplan in an unpublished Order. *See* Dkt. 52, No. 13 Civ. 1333.

[11] ABC does not argue that the Travel Rule is outside the scope of the BSA's whistleblower provision or that it lacks the "force of law." *Segarra*, 17 F. Supp. 3d at 312.

As noted, the Travel Rule imposes different requirements on banks depending on whether they are transmitting (a.k.a. originating) or intermediary banks. In transmittal orders of at least $3,000, a transmitting bank must include certain customer-identifying information. 31 C.F.R. § 1010.410(f)(1). Intermediary banks that receive and then forward a transmittal order, in contrast, must include, in their corresponding order, the same customer-identifying information only "if received from the sender." 31 C.F.R. § 1010.410(f)(2).

Thus, as relevant here, an intermediary bank can violate the Travel Rule by failing to convey customer-identifying information that it received from the transmitting bank. The Memo, standing alone, does not suggest that Taft provided information about such a violation. *See* January 6 Decision at *11. The Memo expresses concern that, "[a]s an intermediary bank, [ABC] does not see ultimate customer information since it is not included in the payment message" and that the transactions "ultimately involve customers that are not identified." Memo at 1. The Memo thus suggests that ABC was not *receiving* certain information, and therefore was not in a position to violate the Travel Rule. Parts of the FRBNY Letter, which is somewhat inscrutable, can be read to suggest the same, as when the FRBNY advises ABC to inform its home office and "other respondents" that they should use the more transparent MT202 COV format for transactions related to customer activity. *See* FRBNY Letter at 2.

However, the phone call and the FRBNY Letter, taken together and drawing reasonable inferences in Taft's favor, make it plausible that Taft provided information suggesting that ABC was hiding information that it *did* receive—conduct which would violate (or at least potentially violate) the Travel Rule. As now alleged, during the phone call, Taft told Hilton that she observed ABC "misusing payment formats" and that she perceived a "lack of information" on "heavy volumes" of trade-finance payments. SAC ¶ 35. These allegations fairly plead that Taft

reported information suggesting not merely that ABC was passing along a transmitting bank's deficient information, but was taking steps to conceal information that was required to be reported. *See also* SAC ¶ 24 (alleging Taft was "concerned that the bank was improperly labeling transactions made on behalf of customers as bank-to-bank transactions to *hide* information regarding the transmittor and recipient") (emphasis added).

Consistent with this, the FRBNY Letter expresses concern that ABC was "inappropriately" using the MT202 format instead of the MT202 COV format. The latter format, it states, "would include details of the underlying originators and beneficiaries or the customers and/or counterparties." FRBNY Letter at 1. This aspect of the FRBNY's response, particularly the words "*would include*," can be read to suggest that the FRBNY understood from Taft that ABC, while *capable* of providing customer-identifying information, was not doing so.

The new allegations also give context to the FRBNY's expression, in its letter, of "concerns of undue BSA/AML and OFAC risks to the branch." FRBNY Letter at 2. Although "undue risks" certainly do not *necessarily* imply violations of law, in light of the SAC's other allegations, they do raise the *possibility* of it, and a possible violation is all that is required to state a claim.[12] Therefore, the SAC adequately pleads that Taft was concerned about, and reported to the FRBNY information regarding, a possible scheme to hide customer-identifying information that ABC had received, by, *inter alia*, using (or, in Taft's words, "misusing") opaque or improper payment formats.

---

[12] Particularly given the FRBNY's express reference to the BSA, ABC's suggestion that Taft reported only possible violations of "the OFAC regime" is not persuasive. ABC Br. 19.

ABC makes counterarguments to the effect that Taft's allegations are implausible because, if they were true, either the FRBNY or Taft herself would have behaved differently than the SAC alleges.

As to the FRBNY, ABC argues that its letter to ABC was "not at all consistent with the behavior of a regulator advised by a whistleblower" of a violation of law.  ABC Br. 17.  ABC's argument is unpersuasive given the standards governing a motion to dismiss.  Although ABC's suggestion that the FRBNY would have reacted to such a disclosure with greater alarm is not without force, the FRBNY Letter is sufficiently stern to suggest that the information that Taft reported concerned a *possible* violation of law.  And that the letter was addressed to ABC's President in China, as opposed to the New York branch alone, may be read to indicate that the FRBNY took the matter seriously.

A footnote in the FRBNY Letter which neither party addresses further supports the inference that the FRBNY had been presented with information evidencing a possible violation of the BSA.  The footnote, which follows the FRBNY's reference to BSA/AML and OFAC risks, includes a link to a 2014 settlement agreement between OFAC and BNP Paribas SA ("BNPP"), pursuant to which BNPP paid OFAC nearly $1 billion to settle claims that it had "engaged in a systematic practice . . . that concealed, removed, omitted, or obscured references to, or the interest or involvement of, sanctioned parties in [SWIFT] payment messages sent to U.S. financial institutions."  *See Settlement Agreement*, Dept' of Treasury, https://perma.cc/79LA-FJ9Z, ¶ 3.  The settlement agreement notes that BNPP had used less transparent payment messages like MT202 for transactions involving sanctioned parties.  *Id.* ¶ 5.  Although the BNPP settlement agreement does not mention intermediary banks, the FRBNY's citation of this sizable settlement agreement involving claims of serious financial misconduct is

at odds with ABC's quotidian characterization of the FRBNY Letter. On the facts pled, the

FRBNY clearly had concerns about some aspect(s) of ABC's practices. At the motion to dismiss

stage, the Court cannot say that these concerns did not bespeak a possible violation of law.

ABC also argues that the fact that Taft did not cite the Travel Rule by name in the phone

call with Hilton "undermines any claim that she was reporting a possible violation of any law or

regulation." ABC Br. 19. ABC notes that Taft "touts her knowledge and experience" as a

compliance officer and that she alleges that the Travel Rule was on her mind by the time she

spoke with Hilton. *Id.* (citing SAC ¶¶ 9, 26, 28). But, as the Court has noted, the BSA does not

require such explicitness. *See* January 6 Decision at *9. A compliance officer who recites the

underlying facts and her attendant concerns need not refer *in haec verba* to a particular provision

to come within the whistleblower protections of the BSA.

Therefore, the Court holds, the SAC adequately alleges that Taft provided information

regarding a possible violation of the Travel Rule.

### c. Other possible theories of Travel Rule violation

In her opposition brief, Taft appears alternatively to pursue a new theory: that ABC was

actually acting as a *transmitting* bank and was "simply claiming to be an intermediary to avoid

providing required information." Taft Br. 20. The Court agrees with ABC that this theory is

inconsistent with the Memo, in tension with the FRBNY Letter, and not adequately alleged in the

SAC. *See, e.g.*, Memo at 1 ("*As an intermediary bank*, [ABC] does not see ultimate customer

information . . . .") (emphasis added).

Taft's submissions, however, can also be taken to imply a subtly different theory of a

potential violation of law consistent with ABC's having acted as an intermediary bank.

Transmitting banks, she suggests, were providing ABC less information about customers than

they were required to provide; ABC knew that the transmitting banks were doing so; and ABC

nevertheless facilitated the transactions. Having held that the SAC squarely pleads a report of a possible Travel Rule violation by ABC (through its alleged failure to convey information in its possession), the Court need not resolve here whether this alternative theory—effectively, aiding and abetting, or willfully assisting, a transmitting bank's violations—would represent a "possible violation" of the Travel Rule. The parties are at liberty in discovery to pursue this alternative theory.[13]

###     C.      Causation

As noted, the January 6 Decision invited the parties to brief the standard of causation in connection with claims under § 5328(a). *See* January 6 Decision at *12 n.17. In response, ABC pursues dismissal on the ground that the SAC "does not plead that ABC was ever made aware" of the topics Taft discussed by phone with Hilton, and thus could not have retaliated against her on account of the phone call. ABC Br. 16.

The SAC's allegations are, however, sufficient to allege such knowledge. The SAC alleges that "ABC learned that Taft had spoken to the FRBNY," and that ABC reacted negatively, by prohibiting employees from unsupervised contact with that regulator. SAC ¶ 38. The reasonable inference is that ABC learned that Taft had covered unflattering topics during the phone call, as Taft elsewhere alleges. *See McNett v. Hardin Cmty. Fed. Credit Union*, 118 F.

---

[13] There are few precedents construing the term "possible violation." In comparison to statutes protecting whistleblowers who *reasonably believe* they are reporting violations of law, *see* 18 U.S.C. § 1514A; 15 U.S.C. § 2087, the Eighth Circuit has stated that the BSA's standard— "information regarding a possible violation"—sets a *lower* hurdle for whistleblowers. *Haley v. Retsinas*, 138 F.3d 1245, 1248 (8th Cir. 1998) ("[A]lthough section 2302(b)(8) requires that the whistleblower reasonably believe the employer has violated the law, section 1831j(a)(2) requires *only* that the disclosure contain information evidencing 'any possible violation of any law.'") (emphasis added). Taft is at liberty to pursue the theory that, as a compliance officer, she *reasonably* believed that an intermediary bank could incur liability under the Travel Rule if it processed transactions knowing that the transmitting bank had violated the Travel Rule by furnishing ABC with legally inadequate customer-identifying information.

App'x 960, 964 (6th Cir. 2004) (reversing summary judgment for defendant where there was genuine issue of material fact regarding whether defendant "realized that . . . [plaintiff] was the [regulator's] source," even where defendant had no actual knowledge). *Johnson v. Department of Defense*, which ABC cites and which turned on the lack of allegations that the decisionmaker "learn[ed] of the protected disclosures prior to terminating petitioner's employment," is thus inapposite. 97 F. App'x 325, 326 (Fed. Cir. 2004) (cited at ABC Br. 15, 16).

ABC also argues that the SAC does not specifically claim that Taft was "retaliated against for what she communicated to Hilton *by phone*." ABC Br. 16 (emphasis added). But while the SAC connects the retaliation most directly to the FRBNY Letter, it also alleges that "ABC's management, who had repeatedly opposed Taft's efforts to even speak with the regulators, became furious at Taft for impacting their business . . . and sought to punish her for doing so." SAC ¶ 46. In context, "impacting their business" is fairly read to connote "impacting their business *by providing information to the FRBNY*." *See also id.* at ¶ 73 ("ABC blamed Taft for opening them up to exposure through her communications with the [FRBNY].").

The Court accordingly finds the causation requirement satisfied, as in its prior decision. *See* January 6 Decision at *11–12.

### D.      Is the FRBNY a "Federal Supervisory Agency"?

ABC raises one final challenge: that Taft provided information to the wrong entity.

The BSA's whistleblower provision protects those who "provided information to the Secretary of the Treasury, the Attorney General, or any Federal supervisory agency." 31 U.S.C. § 5328(a). In briefing the earlier motion to dismiss, the parties did not address this requirement. Therefore, in the January 6 Decision, the Court assumed *arguendo* "that the FRBNY, as a member bank within the Federal Reserve System, is a 'Federal supervisory agency' within the meaning of the statute," January 6 Decision at *4 n.7, while inviting the parties to brief that

issue.  ABC now argues that Taft's claim fails because the FRBNY is not a "Federal supervisory agency."  *See* ABC Br. 20–23.

The BSA does not define that term.  *See* 31 U.S.C. § 5312.  ABC correctly notes that, elsewhere in the U.S. Code, this term encompasses the Board of Governors of the Federal Reserve System ("the Board" or the "Federal Reserve Board"), but not Federal Reserve Banks like FRBNY.  *See* 12 U.S.C. § 1881 (defining "Federal supervisory agency" as "the appropriate Federal banking agency, as defined in section 1813(q) of this title"); 12 U.S.C. § 1813(q) (defining "appropriate Federal banking agency" as including the Federal Reserve Board); *see also* 12 U.S.C. § 1831j(e) (defining "Federal banking agency"); 12 U.S.C. § 2902(1) (defining "appropriate Federal financial supervisory agency").  The term "Federal supervisory agency" in 31 U.S.C. § 5328(a) thus clearly includes the Federal Reserve Board.

There is limited circuit court precedent on whether communications with the regional Federal Reserve Banks, like FRBNY, are protected under the BSA or similar whistleblowing statutes.[14]  In *Hill*, the Sixth Circuit appeared to assume that the "Federal Reserve Bank," as the district court put it, was a "Federal supervisory agency."[15]  *Hill v. Mr. Money Fin. Co.*, 491 F. Supp. 2d 725, 727 (N.D. Ohio 2007); *Hill*, 309 F. App'x at 960.  There are, however, relevant district court authorities.  The Southern District of Ohio held that reports to local Federal Reserve

---

[14] In an arguably analogous context, the Fifth Circuit declined to address whether disclosures to the FBI, "a federal agency falling under the authority of the Attorney General," were protected under a statute protecting disclosures to the Attorney General.  *Schroeder v. Greater New Orleans Fed. Credit Union*, 664 F.3d 1016, 1023 n.6 (5th Cir. 2011).

[15] Because the term "Federal Reserve Bank" as used in *Hill* is potentially imprecise, the Court accessed the record of the case on PACER.  The putative whistleblowing communication was an email to an individual whose address (__@clev.frb.org) indicates that he worked for the Federal Reserve Bank of Cleveland, not the Federal Reserve Board.  *Hill*, No. 06 Civ. 1639 (DAK) (N.D. Ohio), Dkt. 43, Ex. M.

bank examiners "unquestionably" constituted reports to the Board under FIRREA, 12 U.S.C. § 1831j. *Mann v. Fifth Third Bank*, 09 Civ. 14, 2011 WL 1575537, at *3 (S.D. Ohio Apr. 25, 2011).[16] And Judge Peck of this District recently held that, under the Federal Credit Union Act's whistleblower provision, communications with regional National Credit Union Administration examiners could be protected even though the statute refers to the National Credit Union Administration *Board*—the three presidential appointees. *See Balko*, 2014 WL 1377580, at *14–18; *see also McNett*, 118 F. App'x at 964 (parties agreed that speaking with examiner was protected activity). Judge Peck explained that "[t]he statute's parallel reference to the Attorney General"—whom the BSA also identifies as a potential recipient of whistleblowing communications—supported this outcome, because statutory references to the Attorney General in the U.S. Code are usually understood as shorthand for "the Department of Justice or an agency under the Attorney General's authority." *Balko*, 2014 WL 1377580, at *17.

These precedents support holding that 31 U.S.C. § 5328(a) protects a whistleblower's report of possible violations of law not merely to the seven Governors of the Federal Reserve Board, located in Washington, D.C., but to those acting under their authority and on their behalf. *See id.* at *15 ("Balko provided information to NCUA examiners designated by the NCUA Board to act on its behalf."). The FRBNY so qualifies. The Federal Reserve Board is empowered to delegate "any of its functions"—aside from policymaking and rulemaking—to the

_____

[16] ABC's attempts to minimize this case are unavailing. *See* ABC Br. 22 n.11. That defendants "all but concede[d]" the issue is not significant, since the court independently ruled. *See Mann*, 2011 WL 1575537, at *3 ("Defendants, however, cite no authority . . . and the Court finds none."). And the *Mann* court's reference to "Federal banking agency" was appropriate, because FIRREA defines that term to encompass the Federal Reserve Board. 12 U.S.C. § 1831j(e).

Federal Reserve Banks.  12 U.S.C. § 248(k).[17]  And a BSA regulation delegates "[a]uthority to examine institutions to determine compliance with [BSA regulations]" to "the Board of Governors of the Federal Reserve System with respect to those financial institutions regularly examined for safety and soundness by Federal Reserve bank examiners."  31 C.F.R. § 1010.810(b)(2).  The Board's website confirms that the responsibilities delegated to the Federal Reserve Banks "include the conduct of field examinations and inspections of state-chartered member banks, bank holding companies, and foreign bank offices in this country."  Heller Decl., Ex. C, at 6.[18]

More specific to this case, the FRBNY Letter makes clear that the FRBNY conducts examinations of ABC's New York branch on the Board's behalf.  Signed by the "Supervisory Team Manager" in the "Financial Institution Supervision Group," the FRBNY Letter states that it was "prepared by an examiner selected or approved by the Board of Governors of the Federal Reserve System" and is "the property of the Board of Governors."  *Id.* at 2 n.5; *see also id.* at 1 (referring to the FRBNY's prior joint "report of examination").[19]  Notably, the Treasury

---

[17] Quoting this provision, ABC fails to explain why this case implicates the Board's retention of policymaking authority.  *See* ABC Reply Br. 10.

[18] The Court takes judicial notice of this official government website, as is common on motions to dismiss.  *See Wells Fargo Bank, N.A. v. Wrights Mill Holdings, LLC*, 127 F. Supp. 3d 156, 166 (S.D.N.Y. 2015).

[19] The congressional testimony of a Federal Reserve Board member confirms that the Federal Reserve Banks are responsible for conducting examinations, on behalf of the Board, to assure compliance with the BSA:  "It has been our longstanding policy that Federal Reserve supervisors incorporate a Bank Secrecy Act compliance and anti-money laundering program component into every safety and soundness examination *conducted by a Federal Reserve Bank*."  *Bank Secrecy Act Enforcement: Hearing Before the Sen. Comm. on Banking, Housing, and Urban Affairs*, 108th Cong. (2004) (*available at* https://perma.cc/VF3L-KRCV) (statement of Susan S. Bies) (emphasis added); *see also id.* ("During the period of 1995 through 1998, the Federal Reserve, *through the Federal Reserve Bank of New York*, conducted four examinations of Banco Popular.") (statement of Senator Sarbanes, quoting a settlement agreement) (emphasis added).

Department advises that a bank with BSA-related questions may contact *not* the Federal Reserve Board, but the bank's "primary [BSA] examination authority," which in the case of ABC's New York branch, given the above, appears to be the FRBNY. Haviv Decl., Ex. D, ¶ 17. It is no answer that, as ABC notes, the Board has not "delegated interpretation of the BSA and AML requirements to the Federal Reserve Banks." ABC Reply Br. 10. The FRBNY's function relevant to ABC was to perform examinations to assure BSA compliance, a function which ABC does not dispute was delegated to the FRBNY by the Board.

In claiming that reports to the Federal Reserve Banks fall outside § 5328(a)'s protection for whistleblowers, ABC relies on inapposite cases. *See* ABC Br. 21–22. In one, involving the Board's responsibility under the Freedom of Information Act to produce documentation for loans issued by the Federal Reserve Banks, the Second Circuit noted that only the latter have the power to make loans, and thus "Congress divided the powers" between the regional banks and the Board. *Fox News Network, LLC v. Bd. of Governors of the Fed. Reserve Sys.*, 601 F.3d 158, 161 (2d Cir. 2010) (quoting *Fox News Network, LLC v. Bd. of Governors of the Fed. Reserve Sys.*, 639 F. Supp. 2d 384, 396 (S.D.N.Y. 2009)). But that decision rested on the Circuit's judgment that "the lending activities of the Federal Reserve Banks do not take place 'on behalf of' or under the 'delegated authority' of the Board." *Id.* The opposite is true of the Federal Reserve Banks' field examination authority, an issue to which *Fox News* does not speak.

In another case cited by ABC, the Eighth Circuit held that the Federal Reserve Bank of Kansas City was not an "agency" under Federal Rule of Appellate Procedure 4(a)(1)(B), which gives federal agencies 60 days to file a notice of appeal when party to a suit. *Scott v. Fed. Reserve Bank of Kan. City*, 406 F.3d 532, 538 (8th Cir. 2005). But the Circuit acknowledged that "courts have treated the Federal Reserve Banks as federal agencies in other contexts." *Id.* at

537 (citing *Fed. Reserve Bank of Boston v. Comm'r of Corps. & Taxation*, 499 F.2d 60, 62 (1st Cir. 1974)); *see also Raichle v. Fed. Reserve Bank of N.Y.*, 34 F.2d 910, 916 (2d Cir. 1929) (FRBNY is "a governmental agency under the direction of the Federal Reserve Board" as to regulation of open market transactions). And the "[m]ost important[]" consideration for the Eighth Circuit was that "the rationale behind Rule 4 . . . is not applicable" to Federal Reserve Banks. *Id.*

More apposite is *Brink's, Inc. v. Board of Governors of Federal Reserve System*, 466 F. Supp. 116 (D.D.C. 1979), which held that Federal Reserve Banks are federal agencies for purposes of the Service Contract Act. *Id.* at 120. Like this case, *Brink's* involved an undefined statutory term that should be "liberally construed to effectuate the [statute's] humanitarian purposes." *Id.* Similarly here, it is unrealistic to construe § 5328(a) to require an employee, to gain whistleblower protection, to directly contact the Governors of the Federal Reserve Board, the Treasury Secretary, or the Attorney General with a report of possible BSA violations. ABC has cited no case law requiring potential whistleblowers to leapfrog so far up the food chain. *See Balko*, 2014 WL 1377580, at *17 (rejecting defendant's "interpretation of the statutory language" where it "would frustrate the purpose of the legislation and unjustifiably narrow the whistleblower protection Congress intended"). It is more consistent with the statutory purpose to protect a report to a local regulatory examiner, with whom the putative whistleblower may already be familiar.

The Court, therefore, holds that the FRBNY is a "Federal supervisory agency" for purposes of § 5328(a).

## CONCLUSION

For the reasons above, the Court denies ABC's motion to dismiss Taft's BSA

whistleblower claim. On the facts pled in the SAC, Taft acted independently of ABC in providing information to the Federal Reserve Bank of New York—for these purposes a "Federal supervisory agency"—regarding a possible violation of the Travel Rule under the BSA.

The Clerk of Court is respectfully directed to close the motion pending at docket number 61.

SO ORDERED.

*Paul A. Engelmayer*
Paul A. Engelmayer
United States District Judge

Dated: May 12, 2016
New York, New York